**In the Matter of the Petition of NORTHERN STATES POWER COMPANY for Authority to Change its Schedule of Rates for Electric Service in Minnesota.**

No. C7–86–1482.

Supreme Court of Minnesota.

Dec. 11, 1987.

Samuel L. Hanson, John P. Van de North, Jr., St. Paul, Gene R. Sommers, David A. Lawrence, David M. Sparby, Minneapolis, for NSP.

Hubert H. Humphrey, III, Atty. Gen., Craig P. Anderson, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Dept. of Public Service.

Hubert H. Humphrey, III, Atty. Gen. pro se.

Dennis D. Ahlers, Sp. Asst., Michael J. Bradley, Asst. Atty. Gen., St. Paul, for Atty. Gen.

Glenn E. Purdue, William P. Jordan, Minneapolis, for Suburban Rate Authority.

Hubert H. Humphrey, III, Atty. Gen., Karl Sonneman, Sp. Asst., St. Paul, for Minnesota Public Utilities Com'n.

## OPINION

KELLEY, Justice.

In orders following the 1985 rate increase application made by Northern States Power Company (NSP), the Minnesota Public Utilities Commission (MPUC or Commission), while declining to specifically apply a preponderance standard to the evidence produced by NSP in support of application, nevertheless concluded that even had such a standard been applicable, substantial evidence in the record justified its denial of NSP's position on five specific revenue issues. Before the court of appeals NSP contended the MPUC had erred by holding it to a stricter, but undefined, standard of proof, and that the MPUC's findings on five revenue issues were unsupported by substantial evidence. The court of appeals agreed with NSP that the applicable standard of proof in this type of proceeding is

the preponderance of evidence standard. However, it likewise agreed with the MPUC that in this case, at least, "the standard of proof employed was not critical to the outcome." Accordingly, it affirmed the MPUC's findings on four of the contested revenue issues but remanded on the "capital structure" issue ordering a recalculation of the rate of return using NSP's cost of equity percentage figure.[1] The petitions of both parties for further review were granted.[2] We reverse the holding of the court of appeals on the capital structure issue. We affirm on all other issues.

The court of appeals held the quantum of proof in a proceeding before the MPUC following a utilities' application for a rate increase is the "fair preponderance of the evidence" standard. By the failure of the MPUC to contest that holding on this appeal, the holding becomes the law of the case. Additionally, by brief filed in this court the MPUC has indicated that in the future it will follow the ruling of the court of appeals that the "fair preponderance" test should be utilized in ratemaking. Therefore, that issue, insofar as this case is concerned, might appear to be moot, and, as a result, the case should be remanded to MPUC for further proceedings applying that quantum of proof standard. The conclusion does not follow. Because of a misunderstanding of what the fair preponderance of evidence standard means in a ratemaking proceeding, as the court of appeals recognized, application of that standard in the context of the factfinding process in a utility rate case needs further explication.

▇ NSP argues that in a rate application proceeding the MPUC should weigh the evidence under the "fair preponderance" standard in the same manner traditionally employed by courts in a civil case, and that since, in this case, the MPUC failed to do so there should be a remand for further findings. We disagree. While

a "fair preponderance" standard may be applicable in a ratemaking proceeding, the "weighing" to be employed by the utility commission substantially differs from the type of "weighing" traditionally employed by a court in a civil case.

The "weighing" by court in a civil case applying the "fair preponderance" standard involves a determination by the court whether the proponent of the conclusion has produced sufficient credible evidence to sustain that conclusion. In contrast, the task of the MPUC is not so much concerned with the sufficiency and credibility of the evidence, as it is concerned with whether the evidence submitted, even if true, justifies the conclusion sought by the petitioning utility when considered together with the Commission's statutory responsibility to enforce the state's public policy that retail consumers of utility services shall be furnished such services at reasonable rates. *See, e.g.,* Minn.Stat. § 216B.01 (1986). The burden of proof rests with public utility seeking the change to demonstrate that the rate change is just and reasonable. Minn.Stat. § 216B.16, subd. 4 (1986). In evaluating the validity of a rate increase application, the Commission should apply the classic burden of proof analysis employed in civil cases in determining whether the utility has established the amount of a claimed cost as a judicial fact. Ordinarily, as in this case, the amount of the alleged cost is essentially uncontested. But in the exercise of the statutorily imposed duty to determine whether the inclusion of the item generating the claimed cost is appropriate, or whether the ratepayers or the shareholders should sustain the burden generated by the claimed cost, the MPUC acts in both a quasi-judicial and a partially legislative capacity. To state it differently, in evaluating the disputes in the typical rate case the accent is more on the inferences and con-

---

1. *In re Northern States Power Co.,* 402 N.W.2d 135 (Minn.App.1987).

2. NSP appealed, contending that the MPUC decision on all revenue issues must be reversed and redetermined because they are flawed by use of the improper standard of proof, and the Com-

mission's findings on the four revenue issues were unsupported by substantial evidence. The MPUC seeks reversal of the court of appeal's opinion on the capital structure issue. For convenience, NSP will be referred to as appellant; MPUC as respondent.

clusions to be drawn from the basic facts (i.e., amount of claimed costs) rather than on the reliability of the facts themselves. Thus, by merely showing that it has incurred, or may hypothetically incur, expenses, the utility does not necessarily meet its burden of demonstrating that it is just and reasonable that the ratepayers bear the costs of those expenses. As in the typical case, in the present NSP application the basic facts, such as costs and expenses, were essentially undisputed; rather the focus of the dispute was on whether the ratepayers or the shareholders should bear those costs. In such case the MPUC may draw its own inferences and arrive at its own conclusions from the undisputed basic facts. *See, e.g., City of Moorhead v. Minnesota Pub. Utils. Comm'n*, 343 N.W. 2d 843, 846 (Minn.1984); Minn.Stat. § 14.61 (1986). Moreover, in ratemaking, as contrasted to civil litigation, evidence in the hearing record consists mostly of economic facts and the opinions of experts who have analyzed those facts rather than reports of sensorily perceived phenomena. Thus, it becomes apparent that the logic and relevance of the facts to the ultimate determination of whether the rate request is reasonable is of substantially more importance than the quantum of proof needed. Accordingly, we conclude, as did the court of appeals, no matter what standard of proof was employed, it was not crucial to the outcome of this case.[3]

Before commencing our analysis of MPUC's revenue findings, a further note is in order to reiterate the scope of our appellate review. NSP claims here that MPUC's disputed revenue findings are "unsupported by substantial evidence in view of the entire record as submitted." *Cf.* Minn.Stat. § 14.69 (1986). As an administrative agency, the MPUC may exercise two different functions: a quasi-judicial function and a legislative function. *See* Minn.Stat. § 216A.05, subd. 1 (1986). When the MPUC engages in a quasi-judicial function, a reviewing court applies the "substantial evidence" test. *Hibbing Taconite Co. v. Minnesota Pub. Serv. Comm'n*, 302 N.W.2d 5, 9 (Minn.1980).[4] But when the MPUC is engaged in a legislative function, on review the decision will be upheld if the agency acted within its statutory authority, and the result was not unjust, unreasonable, or discriminatory, as shown by clear and convincing evidence. *St. Paul Area Chamber of Commerce v. Minnesota Pub. Serv. Comm'n*, 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977). NSP argues that the revenue issues in this appeal come within the scope of MPUC's quasi-judicial function, and that consequently before those findings can be sustained, the record must contain substantial evidence to support them. In opposing that position, MPUC contends that its finding on the disputed revenue issues involve both the exercise of its quasi-judicial and legislative

3. NSP argues that in a rate case if the utility supplies evidence to support an issue and no, or insufficient, evidence is presented to rebut the utility's position, an unrebuttable presumption arises to meet the burden of proof and requires a finding favorable to the utility as a matter of law. It relies on a series of court cases throughout the United States employing such presumption to utility produced evidence of investments and operating expenses. The cases relied upon by NSP are mostly inapposite because they involve costs actually incurred, such as for capital assets or inventory, or actual investment cash outlays, as distinguished from NSP's proposed ratemaking adjustments that modify the actual accounting employed by it on its books, or to financial decisions by the utility's manager relative to debt-equity ratio considering the money and stock market data. Although NSP recognizes that Minn.Stat. § 216B.16, subd. 4 (1986) places the burden on it to prove need for a rate increase, it contends that burden has been met

by the unrebutted presumption. We disagree. The revenue issues in this appeal do not arise from NSP's "booked expenses"—with the exception of the capital structure issue. None, but the capital structure issue, involved an actual expense recorded in its books. Instead, each proposed adjustment has been hypothetically constructed for the purpose of the rate case. Even if a presumption exists, it is not applicable to the type of revenue issues here involved. *See, e.g., Northwestern Bell Tel. Co. v. State*, 299 Minn. 1, 14–15, 216 N.W.2d 841, 850 (1974).

4. In *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808 (Minn.1977) we defined "substantial evidence" as: (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; and (5) evidence considered in its entirety. 256 N.W.2d at 825.

function, and, therefore, application of both standards of appellate review should be employed by the reviewing court.[5]

■ Just as the traditional "fair preponderance" quantum of proof analysis employed in a civil case differs in some respects from the "fair preponderance" test in ratemaking, so, too, does the "substantial evidence" test applied in appellate review in a rate case differ in some respects from that employed in other contexts and proceedings. As we noted in *Minnesota Power & Light Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 324 (Minn.1983), frequently it is difficult to review commission findings "under the traditional substantial evidence standard because it is not susceptible to precise verification on the evidentiary record due to its judgmental nature." 342 N.W.2d at 330. *See also* Hamilton & Colacci, *Judicial Review of Utility Ratemaking in Minnesota: An Analysis and a Proposal*, 8 Wm. Mitchell L. Rev. 543, 556–57 (1982). In *Minnesota Power and Light* we concluded, "[t]hus, when applying the substantial evidence test to that type of finding, the reviewing court should determine whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *Minnesota Power & Light ·Co. v. Minnesota Pub. Utils. Comm'n*, 342 N.W. 2d 324, 330 (Minn.1983).

(1) Employing those concepts of substantial evidence as used in ratemaking, we proceed first to review the court of appeals' reversal of MPUC's ruling on capital structure. In its petition for a rate increase, NSP proposed a projected capital structure consisting of 43.39 percent long-term debt; 2.19 percent short-term debt; 8.43 percent preferred stock and 45.99 percent common equity. The administrative law judge held that NSP's proposed capital structure enjoyed a presumption of reasonableness, rebuttable by "competent evidence of unreasonableness." Since he also found no competent evidence of rebuttal, he recommended that NSP's proposed capital structure be adopted. The MPUC rejected that recommendation. It found the 45.99 percent cost of equity figure to be unreasonably burdensome to ratepayers and unsupported by evidence in the record. In its stead, the MPUC substituted a hypothetical 45 percent cost of equity figure, and transferred, in its hypothetical capital structure, the disallowed portion of common equity to long-term debt. The court of appeals not only reversed this finding, by holding there was insufficient evidence to sustain it, but, in effect, held that as a matter of law 45.99 percent cost of equity figure was reasonable and remanded this rate case to the Commission ordering a recalculation of return on equity using that 45.99 percent cost of equity figure.[6]

In proceedings before the administrative law judge, NSP introduced evidence from several experts in support of its cost of equity allocation. One expert opined that NSP's proposed figure, though reasonable, was at "the upper end of the scale" based on comparisons with similar capital structures of comparable companies. Another witness made comparison with a group of companies whose equity ratio was 40.8 percent, while a third witness, comparing with a different group of companies, found a cost of equity average ratio of 42.22 percent. Notwithstanding those lower average equity ratios, each of those witnesses testified NSP's capital structure was rea-

5. Without specifically addressing the respective contention of the parties as to the appropriate standard of appellate review on the disputed revenue issues, the court of appeals proceeded to analyze three of the disputed findings as if the MPUC had acted in a quasi-judicial capacity by applying the "substantial evidence" standard, but in analyzing the other disputed findings, it seemingly recognized the MPUC had exercised this legislative function. *See In re Northern States Power Co.*, 402 N.W.2d 135, 139–143 (Minn.App.1987).

6. Our disposition of the underlying issue makes it unnecessary for us to review the propriety of an appellate court ordering the Commission to adopt a specific figure, but we do observe that this function, by statute, ordinarily rests with the Commission. *See, e.g., In re Continental Tel. Co.*, 389 N.W.2d 910, 916 (Minn.1986); *In re Northwestern Bell Tel. Co.*, 310 Minn. 146, 150–51, 246 N.W.2d 28, 31 (1976); *Hibbing Taconite Co. v. Minnesota Pub. Serv. Comm'n*, 302 N.W.2d 5, 9 (Minn.1980).

sonable. A witness produced by a protesting party, Dr. Zapp, contested NSP's allocation on the grounds that NSP's high equity ratio placed an unnecessary and unreasonable burden on ratepayers, while simultaneously lowering the risk for shareholders. He suggested a cost of equity figure of 42.5 percent. No witness gave testimony suggesting that the 45 percent cost of equity figure ultimately chosen by the MPUC was appropriate. The Commission, however, rejected NSP's cost of equity allocation, and likewise rejected the 42.5 percent cost of equity figure suggested by Dr. Zapp. It concluded that NSP had failed to "come forward with sufficient evidence to justify the reasonableness of its capital structure for ratemaking purposes." It likewise took cognizance that its previous orders had expressed concern for the dramatic escalation in the cost of equity in NSP's proposed capital structure. In the light of all the evidence, particularly that of two expert witnesses, who generally supported NSP's proposed allocation, but who stated that NSP's proposed cost of equity ratio was above the average of comparable companies, the MPUC concluded that NSP had failed to meet its burden of proof.[7] In its stead, the MPUC concluded a 45 percent cost of equity allocation in a hypothetical capital structure would result in a fairer and more reasonable allocation of the burden to be borne by ratepayers and shareholders.

NSP argues, and the administrative law judge agreed, that by proof of its actual capital structure, there arose a "rebuttable presumption of reasonableness" which could be overcome only by competent evidence in rebuttal. However, the MPUC rejected that contention, reasoning that be-

cause the company had at all times the burden of proving the proposed rate charge, and by necessity the components that form the basis for the proposal, Minn. Stat. § 216B.16, subd. 4 (1986), that in this instance that burden had not been met.

NSP's rebuttable presumption contention is bottomed on two federal cases and one Minnesota case. In 1923 in a concurring opinion in *Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 289 n. 1, 43 S.Ct. 544, 547 n. 1, 67 L.Ed. 981 (1923), it was suggested that if not a presumption, an implication could be drawn that a utility's decision to make an investment was made in the exercise of reasonable judgment. Later, in 1935 the United States Supreme Court in *West Ohio Gas Co. v. Public Utility Commission*, 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761 (1935) said, "[g]ood faith is to be presumed on the part of the managers of a business * * * as to the measure of a prudent outlay." NSP, the administrative law judge and the court of appeals likewise rely upon a statement of this court in *Northwestern Bell Telephone Co. v. State*, 299 Minn. 1, 14–15, 216 N.W.2d 841, 850 (1974).[8]

The MPUC counters that neither the federal nor the state cases support NSP's contention; that the context in which the statements were made no longer exists by virtue of the enactment of later statutes governing ratemaking in Minnesota. It points out that the reliance upon *Northwestern Bell* is misplaced because it relates to a practice of "trending book value rate base to determine the current value rate base." How that was then done is described in *Northwestern Bell Telephone Co. v. State*, 299 Minn. 1, 7, 216 N.W.2d 841, 846 (1974). However, it is inapplicable to the issue here

---

7. The MPUC finding read, in part:
 The excessive equity ratio proposed by NSP for ratemaking purposes places an unreasonable burden on NSP's ratepayers through an unnecessarily high overall cost of capital. The Commission agrees with Dr. Zapp that if NSP management chooses to maintain a higher than needed equity ratio, then the shareholders, not NSP's customers, should pay the increased cost of capital.

8. The statement is:

 We have difficulty accepting the concept that *in a rate case of this kind* the state may collaterally attack the judgment of the company in maintaining its embedded debt at a low figure. We agree with the position of the company that this is a discretionary matter of management which, in the light of soaring interest rates, seems to indicate the company's decision to keep its debt obligations to a minimum.
 *Northwestern Bell*, 299 Minn. at 14–15, 216 N.W. 2d at 850 (emphasis supplied).

because, MPUC contends, (1) this presumption is specifically limited in its application to the context of the "trending" process then being discussed by the court when it employed the words "in a rate case of this kind," and (2) that only statutes regulating telephone companies in 1974 provided for that procedure; since then those statutes have been repealed and replaced with Minn. Stat. § 237.075 (1986).[9] Furthermore, the Commission contends that even NSP in its brief has acknowledged that the alleged presumption has been modified in some jurisdictions by statute; and MPUC asserts the Minnesota legislature has done so, if such a presumption ever existed in utility ratemaking in this state, by enactment of Minn.Stat. § 216B.16, subd. 4 (1986), which unequivocally places the burden of proof to establish the reasonableness of a rate change upon the public utility. Thus, the Commission contends the application of the alleged presumption alluded to in the cases relied upon by NSP is irrelevant.

■ We agree with the Commission. If there ever existed in this state a presumption to be applied in ratemaking, enactment of Minn.Stat. § 216B.16, subd. 4 (1986) effectively removed any presumption, and placed on the petitioning utility the burden of proving the proposed rate is fair and reasonable, and, as a component of the rate base, that the capital structure debt-equity allocation is fair and just. When, in the Commission's judgment, a petitioning utility has failed to establish the reasonableness of costs which it claims justifies a proposed rate increase, the Commission itself may compute a hypothetical capital structure that will afford an ulti-

mate determination of a reasonable and just rate. *See, e.g., General Tel. Co. of the Northwest v. Idaho Pub. Utils. Comm'n,* 109 Idaho 942, 944–45, 712 P.2d 643, 645–46 (1986). Moreover, in setting rates, by necessity, regulatory commissions must scrutinize the judgments of utility management for ratemaking purposes. *Communications Satellite Corp. v. FCC,* 611 F.2d 883 (D.C.Cir.1977).[10] Such authority extends to the creation of a hypothetical capital structure. *See, e.g., South Central Bell Tel. Co. v. Louisiana Pub. Serv Comm'n,* 373 So.2d 478, 483 (La.1979).

■ The remaining question is: did NSP meet that burden of showing that the proposed capital structure change is just and reasonable? The MPUC contends that it did not. To resolve the question requires application of the preponderance of evidence analysis appropriate to a ratemaking procedure—to wit, whether the evidence submitted, even if true, justifies the conclusion reached. In *Minnesota Power & Light v. Minnesota Public Utilities Commission* we held that a reviewing court, in employing the substantial evidence test in ratemaking, should ascertain whether the Commission has adequately explained how it arrived at its conclusion and whether the conclusion is reasonable. 342 N.W.2d 330. Our independent examination of the Commission's orders leads us to the conclusion that the Commissioner has adequately articulated its reasoning employed to reach its conclusion that NSP had failed to establish the proposed rate as being "just and reasonable," and that the Commission's conclusion itself was reasonable. Even

9. That statute providing for the regulation of telephone and telegraph companies, has been amended so that Minn.Stat. § 237.075, subd. 6 (1986) now parallels Minn.Stat. § 216B.16, subd. 6 (1986).

10. The court there stated:
 [I]t is well settled in public utility law that it is no interference with this management prerogative for a regulatory commission to impute a hypothetical capital structure, whether or not the regulated company increases its debt; for that is done merely in pursuance of the Commission's legitimate rate-making authority.
 \* \* \* \* \* \*

Perhaps the ultimate authority for imputing debt when necessary to protect ratepayers from excessive capital charges is the Supreme Court's statement in *Hope Natural Gas,* that "The ratemaking process under the Act, i.e., the fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests." 320 U.S. at 603, 64 S.Ct. at 288. The equity investor's stake is made less secure as the company's debt rises, but the consumer ratepayer's burden is alleviated. It is these conflicting interests that the Commission is to reconcile.
*Id.* 903–904.

though some witnesses testified NSP's proposed capital structure was within the range of the capital structure of comparable utilities, even they conceded it was in the high range. Other evidence in the record showed lower cost of equity in substantially comparable utilities. In previous rate proceedings, MPUC had clearly expressed its concern of NSP's escalating cost of equity allotment in capital structure. Inclusion of NSP's proposed cost of equity allotment of 45.99 percent would place additional burden on ratepayers.[11] The conclusion that it was more just and reasonable that shareholders rather than ratepayers bear that burden, in the light of the facts of this case, cannot be said to be unreasonable. Consequently, we reverse that part of the opinion of the court of appeals that holds that MPUC's decision was unsupported by substantial evidence.

■ (2) NSP likewise appealed from the Commission's order allowing a 12.81 percent rate of return on common equity. In affirming the MPUC, the court of appeals held that the Commission had articulated factual support for its conclusion, and, therefore, the conclusion was supported by substantial evidence.[12]

Before the administrative law judge, expert opinion varied on the reasonable rate of return on equity from a high of 15 percent, from an expert produced on behalf of NSP, to 12 percent, from an expert produced by the Metropolitan Senior Federation. The administrative law judge, adopting the figure proposed by one witness, recommended a rate of return of 13.-66 percent. In rejecting that recommendation, as well as rejecting specific rates of return on equity advanced as reasonable by other witnesses who testified before the administrative law judge, the Commission relied in part upon testimony of Dr. Thompson, the Department of Public Service witness, to calculate the dividend yield. How-

ever, it utilized data collected over a one-year period to "smooth volatility," and selected more recent periods for current data. In so doing, the Commission observed that it had applied its own expert judgment to the analysis presented by the various witnesses, but had arrived at a conclusion at variance with that of any witness who testified.

On appeal NSP's principal contention on this issue is that in arriving at its allowable rate of return on equity, the Commission impermissibly considered data not in the record, primarily from the Wall Street Journal—in particular stock prices from December 1985 through April 1986. The Commission claims its allowance of rate of return on equity was based solely on the record data. While it concedes that it did take notice of stock quotations as well as Federal Energy Commission figures, it contends that those figures were only mentioned as corroborating the conclusion it had reached based upon the record data. Moreover, it claims it gave sufficient notice to comply with Minn.Stat. § 14.60, subd. 4 (1986). NSP argues that notice to meet the demands of that statute is proper only when it specifically notifies parties of the Commission's intent to administratively notice nonrecord evidence and affords the parties an opportunity to contest the evidence, but that in this case MPUC's alleged notice failed to meet that requirement.

We affirm the court of appeals' conclusion that MPUC's allowance of the rate of return on common equity was supported by substantial evidence in the record. In the determination of the dividend yield component, some judgment is necessarily involved. *See* Hamilton and Colacci, *Judicial Review of Utility Ratemaking in Minnesota: An Analysis and a Proposal,* 8 Wm. Mitchell L. Rev. 543, 554–55 (1982). Our examination of the orders of the Commission reveals that the MPUC explained

---

11. At oral argument it was explained that the cost of equity allocation of 45.99 percent as compared to a 45 percent allocation would involve approximately $4 million.

12. Although the court of appeals affirmed the finding, that issue likewise was remanded by it

to the Commission for reconsideration in the light of the court of appeals' holding that the Commission's determination on the cost of equity component was improper. *In re Northern States Power Co.,* 402 N.W.2d 135, 142 (Minn. App.1987).

this reasoning in arriving at its allowance of rate of return by substantial evidence existing in the record, as those terms are defined in *Minnesota Power & Light Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 324, 330 (Minn.1983). At best, it is far from clear that the Commission did rely on such alleged post-hearing evidence other than for corroborative purposes. Because the record contains sufficient evidence to sustain the MPUC decision on this issue it is unnecessary for us to address NSP's contention that MPUC had improperly relied upon post-hearing evidence.

■ (3) NSP (Minnesota) provides electric service in Minnesota, North Dakota, and South Dakota. Therefore, it must allocate its rate base, expenses and revenues among the three jurisdictions. In prior electric general rate proceedings in all three states, NSP employed a rate base allocation by use of what is known as the "summer-winter" method. In this 1985 petition, NSP proposed to change the allocation method to an "average 12–monthly coincident peak" (12CP) method. The administrative law judge recommended that NSP's proposed cost allocation be rejected. In adopting that recommendation, the Commission found the 12CP allocation method would result in the allocation of more costs being attributed to Minnesota ratepayers than to those in the Dakotas, which, according to a finding of the administrative law judge, would increase the revenue needed from Minnesota ratepayers by $2.3 million. Because the 12CP method is not in force in either North or South Dakota, there would be no corresponding decrease in revenues NSP receives from its ratepayers in those states. Thus, permitting the use of that allocation method in this case would result in a windfall double recovery to the utility. It concluded that NSP should "use a consistent allocation method to distribute costs among the three jurisdictions to avoid over- or under-recovery of the Company's revenue requirements."

On appeal that ruling was affirmed. The court of appeals determined that substantial evidence existed to support the Commission's action because the Commission had adequately explained its conclusion. We affirm.

As did the court of appeals, we reject NSP's contention that MPUC's disapproval of the 12CP method was based on NSP's action in another state where the MPUC had no jurisdiction. In its order the Commission makes it clear that its rejection of the 12CP method was based upon the fact that a change in Minnesota to the requested 12CP allocation method, without a similar change in other jurisdictions, would unjustly and unreasonably burden Minnesota ratepayers.

■ (4) One of the appealed revenue issues, referred to in these proceedings as the "delay in payment" issue, concerns NSP's proposed rate adjustment to reflect a time lag between the time NSP records or "books" certain items—depreciation and deferred income tax expenses—and the time that payments are received from ratepayers to cover those costs. NSP claims there is a 43–day lag before those alleged costs are recovered. Therefore, it claims it should be allowed an adjustment in its rate base to compensate for the alleged lag time. If the Commission granted NSP's proposal, NSP's rate base would be increased by $22.7 million and its revenue requirements increased by $6 million, which would be paid by the ratepayers. In rejecting this claim, both the administrative law judge and the Commission explained that depreciation and tax deferments, after being recorded as an expense, are not cash items because they do not represent capital supplied by the investor and, therefore, do not properly belong in the rate base. Both the administrative law judge and the Commission relied on eight prior Commission orders rejecting similar claims by utilities. In approving the Commission's ruling on this issue, the court of appeals held that the Commission had adequately explained its conclusions to satisfy the substantial evidence analysis of *Minnesota Power & Light Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 324, 330 (Minn. 1983).

NSP asserts that denial of this "delay in payment" claim deprives it of a timely de-

duction for those costs allowing for recovery for the time lag. Here the record shows without dispute that depreciation and deferred income tax expense are non-cash items, and that lag days measure cash flow. That factual conclusion is well supported by substantial evidence, using that term in the traditional civil action sense. However, whether the "delay in payment" claim should be allowed in the rate base involves the relevancy of, and the policy to be applied to, those established facts. Depreciation expense is an annual expense which theoretically represents the cost of using up physical plant during the year. In ratemaking, the investors are compensated by the ratepayers providing a return on the average rate base for the test year which includes annual depreciation expense. Thus, the Commission could conclude, as it did, that use of the "delay in payment" adjustment as here proposed by NSP, would overstate the rate base, and allow NSP an "excessive" return on investor supplied funds. When a utility "books" depreciation expense, the depreciation reserve is increased. That, in turn, decreases the ledger item, physical plant investment. Allowance of a "delay in payment" adjustment, adds back to the plant investment which theoretically was consumed and removed from the rate base. Neither depreciation nor deferred tax expense is part of working capital or a physical plant investment. Therefore, it is inappropriate to include them in the rate base. Consequently, we conclude that the Commission's decision to exclude NSP's "delay in payment proposal" for recoupment of depreciation and deferred income tax was reasonable and sustained by substantial evidence in the record.

 (5) Pursuant to Minn.Stat. § 216B.241, subd. 2 (1986), the MPUC directed NSP to implement public utility conservation improvement programs (PUCIP), conservation improvement programs (CIP), and utility renewable resource pilot programs (URRPP). In 1985, the Commission approved NSP's deferred debit accounting relating thereto; that is, permitting recovery of such costs in the future for the CIP and URPP programs. It also approved

NSP's PUCIP projects, and permitted NSP to account for the project expenditures in a deferred debit account and to collect a carrying charge on the debit. In NSP's current rate proposal, NSP proposes a carrying charge for the deferred debit accounts for its CIP and URRPP expenses. NSP further seeks to accumulate a carrying charge on the unamortized balance of the CIP, URRPP, and PUCIP accounts, explaining that the unamortized balance is "that balance not yet recovered from ratepayers during the recovery period."

The Commission permitted NSP to accumulate a carrying charge on the deferred debit accounts until such time as the actual recovery of expenses from ratepayers begins. However, the Commission denied NSP's request for carrying charges during the actual recovery year. In support of its denial, the Commission adopted the reasoning of the administrative law judge that carrying charges for the amortization period are "inappropriate * * * because the deferred debit accounts represent extraordinary ratemaking and [are] a temporary expedient to be eliminated as soon as the cost included in it can be built into rates."

By denying NSP's request to recover a carrying charge, the Commission struck a balance between the competing interest of the ratepayers and the investors. Under the Commission's decision the ratepayers will pay not only the deferred expense, but also the cost of money upon a substantial portion of that expense. The Commission's holding that the ratepayer should not be additionally required to pay a return on the moneys in the year which the ratepayers pay the expense, involves a judgmental call, is not without precedent in Minnesota ratemaking, is a reasonable exercise of balancing, and is not arbitrary. *See, e.g., Northwestern Bell Tel. Co. v. State*, 253 N.W.2d 815, 822 (Minn.1977). We therefore affirm the Commission decision on this issue.

We hold that substantial evidence in the record exists to affirm the MPUC's decision to reject NSP's capital structure proposal; that, on this record, MPUC did not err in substituting in its stead a hypotheti-

cal capital structure reflecting its judgment of a more just and reasonable cost of equity; and that substantial evidence in the record exists to sustain the MPCU decision on the four remaining contested revenue issues. Therefore, we reverse the court of appeals on the "capital structure" issue, and affirm on all other issues.