In the Matter of the Application of IN-
TERSTATE POWER COMPANY for
Authority to Increase Its Rates for
Electric Service in the State of Minne-
sota.

No. C3–92–2234.

Court of Appeals of Minnesota.

June 1, 1993.

Clement F. Springer, Jr., William D. Carstedt, Defrees & Fiske, Chicago, IL, for relator Interstate Power Co.

Hubert H. Humphrey, III, Atty. Gen., Margie E. Hendriksen, Anu Seam, Sp. Asst. Attys. Gen., St. Paul, for respondent MN Public Utilities Com'n.

Scott M. Wilensky, Sp. Asst. Atty. Gen., St. Paul, for MN Dept. of Public Service.

Considered and decided by ANDERSON, C.J., and SCHUMACHER and STONE,* JJ.

## OPINION

ANDERSON, Chief Judge.

Relator Interstate Power Company (Interstate) petitioned the Minnesota Public Utilities Commission (MPUC) to increase electric service rates for its Minnesota customers. The MPUC issued findings of fact, conclusions of law, and an order disallowing as a claimed expense Interstate's demand charge cost of 100 megawatts of power the MPUC determined was excess capacity. Interstate petitioned for reconsideration, and after reconsideration, the MPUC issued an order reaffirming its original decision on the excess capacity issue. Interstate obtained a writ of certiorari, seeking review of the MPUC's original decision and order after reconsideration. We affirm.

## FACTS

Interstate is an investor-owned electric and gas utility serving portions of Iowa, Illinois, and Minnesota. Interstate's service to Minnesota customers is regulated by the MPUC.

In August 1991, Interstate entered into long-term contracts with United Power Association (UPA), Iowa Public Service (IPS), and Minnesota Power (MP) for the purchase of electric power. All three contracts included demand charges[1] and are effective May 1, 1992 through April 30, 2001. Interstate allocated Minnesota's portion of the demand charges for those contracts as follows:

| Seller | Date of Contract | Amount of Power | Demand Charge |
|---|---|---|---|
| UPA | August 7, 1991 | 100 MW (megawatts) | $1,833,394.00 |
| IPS | August 12, 1991 | 100 MW | $1,958,117.00 |
| MP | August 14, 1991 | 30 MW | $ 227,155.00 |
| | | | $4,018,666.00 |

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

1. A "demand charge" allocates to a utility's customers their fair portion of fixed costs that must be incurred to supply sufficient capacity for the customers' demands, regardless of the amount of power that is actually supplied. *Antioch Milling Co. v. Public Serv. Co.,* 4 Ill.2d 200, 207–08, 123 N.E.2d 302, 306 (1954).

In the same month it signed the contracts, Interstate filed a petition with the MPUC to increase electric service rates for its Minnesota customers. Interstate requested the $4,018,666 in demand charge costs be included as a test-year operating expense in its rate case.[2] Interstate claimed the demand charge costs of the three contracts would offset costs that would otherwise be necessary to generate more expensive power at Interstate's Lansing, Michigan plant (Lansing plant).

In January 1992, an administrative law judge (ALJ) conducted a hearing on Interstate's petition. Following the hearing, the ALJ found that, as a result of the three contracts, Interstate would have 100 megawatts of annual excess capacity. The ALJ concluded that the IPS contract was unnecessary. Accordingly, the ALJ recommended that Interstate's test-year expenses be reduced by $1,958,117—the demand charge for the 100 megawatts of capacity purchased from IPS.

On June 12, 1992, the MPUC reviewed the ALJ's recommendations and issued its own findings of fact, conclusions of law, and order. The MPUC agreed with the ALJ that Interstate's three contracts would result in 100 megawatts of annual excess capacity. The MPUC also found that Interstate had entered into the three contracts based upon an invalid demand forecast, and that Interstate's reliance on the forecast had been imprudent.

The MPUC did not specifically adopt the ALJ's recommendation that the 100 megawatts of excess capacity should be attributed to the IPS contract. Instead, the MPUC concluded:

A convenient and appropriate *proxy* to indicate the cost of this amount of electricity is the price [Interstate] has contracted to pay IPS for 100 MW [megawatts] per year. The IPS contract amount for 100 MW [megawatts] per

year, $1,958,117, will be excluded from the test year cost of service.
(Emphasis added.)

Interstate petitioned the MPUC for reconsideration of its June 12, 1992 order. On October 19, 1992, the MPUC issued an order reaffirming its decision to exclude the cost of the IPS contract, using it as a proxy for the demand charge cost of 100 megawatts of excess power.

## ISSUES

I. Did the MPUC err by assigning the demand charge cost of the IPS contract as a proxy for the 100 megawatts of excess capacity?

II. Did the MPUC err by failing to offset the demand charge cost of the IPS contract by alleged savings that would result from the IPS contract?

III. Did the MPUC err by excluding the demand charge cost of 100 megawatts of excess capacity as an expense, rather than making adjustments for that excess capacity through the statutory fuel adjustment clause?

## ANALYSIS

■ A public utility seeking a change in rates has the burden of proving the rate change is just and reasonable. Minn.Stat. § 216B.16, subd. 4 (1990). When reviewing a public utility's request for a change in rates, the MPUC must allow the utility and its investors a reasonable profit, while at the same time ensuring that ratepayers are furnished utility service at reasonable rates. *In re Petition of Northern States Power Co.*, 416 N.W.2d 719, 722 (Minn. 1987) (*Petition of NSP*); *Northern States Power Co. v. Minnesota Pub. Utils. Comm'n*, 344 N.W.2d 374, 378 (Minn.1984). "Any doubt as to reasonableness should be resolved in favor of the consumer." Minn. Stat. § 216B.03 (1990).

■ When determining whether ratepayers or investors should bear the expense of a claimed cost, the MPUC acts in

**2.** A "test year" is a period of 12 consecutive months used for evaluating a need for a change in rates.

both a quasi-judicial and a legislative capacity. *Petition of NSP*, 416 N.W.2d at 722. When the MPUC acts in a quasi-judicial capacity, a reviewing court will apply the substantial evidence standard of review. *Id.* at 723. In other words, the court will determine whether the MPUC has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record. *Id.* at 724. When the MPUC acts in a legislative capacity, its decision will be upheld on appeal if it acted within its statutory authority, and the result was not "unjust, unreasonable, or discriminatory, as shown by clear and convincing evidence." *Id.* at 723.

## I.

Interstate has conceded for purposes of this appeal that its 1990 and 1991 forecasts were inaccurate, and does not challenge the MPUC's finding that it imprudently purchased 100 megawatts of excess capacity in reliance on those forecasts. Interstate argues, however, that the MPUC erred by assigning the demand charge cost of the IPS contract as a proxy for the 100 megawatts of excess capacity.

■ Although the MPUC has the duty to establish reasonable rates, it must do so based upon the evidence submitted by the parties. *See In re Petition of Continental Tel. Co.*, 389 N.W.2d 910, 914–15 (Minn. 1986). A petitioning utility has the burden of proving to the MPUC that its proposed assets and revenue requirements are accurate, just, and reasonable; if the petitioner's evidence is inaccurate, the utility has failed to meet its burden of proof, and the MPUC will either deny the rate increase or make "appropriate adjustment" to the utility's proposal. *Id.* at 916.

■ The MPUC determined Interstate's forecast was incorrect and chose to make an "appropriate adjustment" to Interstate's proposal rather than to deny Interstate's

rate request in its entirety. A financial analyst with the Department of Public Service (DPS) had proposed that the demand charge cost of the IPS contract be excluded, and the ALJ recommended that the MPUC adopt the DPS' proposal. The MPUC provided only a limited explanation for its decision to use the demand charge cost of the IPS contract as a proxy for the cost of 100 megawatts of excess capacity. However, Interstate has failed to demonstrate that the MPUC committed reversible error by using the IPS contract as a proxy. In light of our narrow standard of review, we are not persuaded the MPUC exceeded the bounds of its authority or acted in an unjust, unreasonable, or discriminatory manner.

## II.

■ Interstate claims that by using the 100 megawatts of "excess capacity," it can save approximately $1.8 million per year in costs that would otherwise be necessary to generate 100 megawatts of more expensive power at its Lansing plant. Therefore, Interstate argues the MPUC erred by failing to offset the demand charge cost of the IPS contract by the alleged savings that will result from the IPS contract. We disagree.

There is some evidence in the record to support Interstate's claim that the 100 megawatts of IPS power may be less expensive than 100 megawatts of power from the Lansing plant. Specifically, there is evidence that the demand and energy charge cost of IPS energy will be less than $27 per megawatt hour, whereas the Lansing plant operating costs alone are $28.90 per megawatt hour. However, Interstate has pointed to no evidence indicating that the IPS power will actually replace the Lansing plant power, or that the Lansing plant will be "idled," as Interstate suggests the MPUC found.[3] Further, Interstate's

---

**3.** The MPUC in its order after reconsideration stated: "That 100 MW of electricity is more efficiently produced does not overcome the fact that the 100 MW is excess, i.e. more than is necessary to meet the needs of [Interstate's] customers. In fact, in proposing to use the new

IPS capacity to 'displace' 100 MW from one of its other plants, [Interstate] is idling the other plant, eliminating [its] costs of producing 100 MW thereby demonstrating the very excess capacity it denies." This discussion by the MPUC is in the context of addressing the excess capaci-

claim that it could idle the Lansing plant supports the MPUC's conclusion that Interstate has 100 megawatts of excess capacity.

Interstate suggests that the MPUC should have used the fixed charge portion of the Lansing plant as a proxy for the 100 megawatts of "excess" capacity. This argument is not persuasive. Interstate has cited no specific evidence in the record of the "fixed charge portion" of 100 megawatts of capacity at the Lansing plant. Without this evidence, the MPUC could not have used this alternative method as a proxy for the demand charge cost of 100 megawatts of excess capacity.

Interstate also argues that the demand charge costs of the IPS contract should be included as a test-year operating expense because the capacity contracts will save $147.6 million during the next ten years by avoiding baseload generation and construction costs. We note that $147.6 million is the alleged cost savings of all three contracts, not just the IPS contract. Further, the MPUC found in its order after reconsideration that the claim of savings was not convincing because it was based upon Interstate's invalid load forecast.[4] On appeal, Interstate does not challenge the MPUC's determination that the load forecasts were invalid. Since the claimed savings were based upon invalid load forecasts, the MPUC properly rejected those claimed savings as "unconvincing."

Finally, Interstate claims that the DPS forecast, which the MPUC found to be valid, also indicated that $147.6 million would be saved in baseload generation and construction costs during the next ten years. Interstate fails to support this claim with any explanation or citation to the record.

As a result of having purchased excess capacity, Interstate has 100 megawatts of power that it may sell. Interstate's shareholders have the ability to earn income from the sale of the excess capacity of 100 megawatts of power. It is more appropriate for Interstate's shareholders, rather than its ratepayers, to bear the risks associated with any sale of power that results from the excess capacity.

## III.

Interstate argues that the MPUC erred by excluding the demand charge cost of 100 megawatts of excess capacity as an expense instead of allowing the expense and making adjustments for the excess capacity through the statutory fuel adjustment clause.

Minnesota's fuel adjustment clause provides:

Notwithstanding any other provision of this chapter, the [MPUC] may permit a public utility to file rate schedules containing provisions for the automatic adjustment of charges for public utility service in direct relation to changes in: (1) federally regulated wholesale rates for energy delivered through interstate facilities; (2) direct costs for natural gas delivered; or (3) costs for fuel used in generation of electricity or the manufacture of gas.

Minn.Stat. § 216B.16, subd. 7 (1990). The MPUC has explained the purpose of this clause and the rules enacted thereunder:

The purpose * * * is to enable regulated gas and electric utilities to adjust rates to reflect changes in the cost of energy delivered to customers from those costs authorized by the commission in the utility's most recent general rate case.

Minn.R. 7825.2390 (1991). Because rate proceedings are generally slow and cumbersome, automatic fuel adjustment clauses allow for fluctuations in fuel costs that could either drive a utility out of business or result in windfall profits. *Montana Consumer Counsel v. Public Serv. Comm'n,* 168 Mont. 180, 189, 541 P.2d 770, 775 (1975). *See Consumers Org. for Fair Energy Equality, Inc. v. Department of*

---

ty issue, and does not support Interstate's claim that the MPUC assumed Interstate would in fact replace the Lansing power with the IPS power.

**4.** In its June 12, 1992 order, the MPUC noted that Interstate's failure to consider capacity available through the Midwest Area Power Pool (MAPP) "compounded [Interstate's] defective demand forecast."

**506**

*Pub. Utils.*, 368 Mass. 599, 601–02, 335 N.E.2d 341, 343 (1975); *Detroit Edison Co. v. Michigan Pub. Serv. Comm'n*, 82 Mich. App. 59, 68, 266 N.W.2d 665, 670 (1978), *aff'd*, 416 Mich. 510, 331 N.W.2d 159 (1982); *State ex rel. Utils. Comm'n v. Edmisten*, 291 N.C. 327, 330, 230 S.E.2d 651, 653 (1976) (fuel adjustment clause is a formula for raising or lowering rates to reflect fluctuating fuel costs).

■ In the present case, Interstate suggests that the MPUC should have utilized the fuel adjustment clause in one of two ways. First, Interstate argues that the MPUC should have authorized it to exclude the lower IPS fuel costs from its system-wide fuel costs. This procedure would allow Interstate to recover higher rates, which would counterbalance the exclusion of the IPS demand charge costs as an expense.

The MPUC rejected this proposal, concluding that Interstate's proposed use of the fuel adjustment clause was not contemplated by the legislature. The MPUC explained:

> The purpose of the fuel clause is to recover actual fuel costs. Through this clause, [Interstate] recovers exactly what [the fuel] costs.

Second, Interstate proposed that the MPUC authorize it to include the demand charge costs of 100 megawatts of excess capacity as an expense, and recoup through the fuel adjustment clause any revenue from the sales of that excess capacity. The MPUC rejected this proposal, reasoning:

> The [MPUC] finds that the mechanism proposed by Interstate * * * is inappropriate. The fuel clause is not a method to offset various costs and revenues unrelated to fuel. The [MPUC] finds that this proposal is unreasonable and conflicts with the intent of the fuel clause.

In addition, the MPUC found that IPS' second proposal conflicted with the test-year concept, since any revenues from proposed sales of excess capacity would be theoretical and did not appear in Interstate's operating income statement for the test year.

We conclude the MPUC correctly refused to apply the fuel adjustment clause in either manner requested by Interstate. The fuel adjustment clause is designed to automatically adjust for actual fuel costs, and should not be used in a manner inconsistent with this purpose.

## DECISION

The MPUC's decision to disallow the demand charge cost of the excess power capacity as an operating expense and to use the IPS contract as a proxy for the excess 100 megawatts of power was supported by substantial evidence and was not unjust, unreasonable, or discriminatory, as shown by clear and convincing evidence. The MPUC provided reasoned explanations for its refusal to utilize the fuel adjustment clause as suggested by Interstate.

**Affirmed.**