**In the Matter of the REQUEST OF INTERSTATE POWER COMPANY FOR AUTHORITY TO CHANGE ITS RATES FOR GAS SERVICE IN MINNESOTA,**

No. C1–96–1558.

Court of Appeals of Minnesota.

Feb. 18, 1997.

Review Granted April 24, 1997.

Michael J. Bradley, Moss & Barnett, Minneapolis, for relator Interstate Power Company.

Brent L. Vanderlinden, Assistant Attorney General, St. Paul, for relator Minnesota Department of Public Service.

Joan Susan Allender, Assistant Attorney General, St. Paul, for respondent Minnesota Public Utilities Commission.

Eric F. Swanson, Assistant Attorney General, St. Paul, for relator Hubert H. Humphrey, III.

Considered and decided by SHORT, P.J., TOUSSAINT, C.J., and HUSPENI, J.

## OPINION

TOUSSAINT, Chief Judge.

The Minnesota Department of Public Service and the Office of the Attorney General seek certiorari review of a Minnesota Public Utilities Commission decision requiring that Interstate Power Company's natural gas ratepayers contribute to environmental cleanup costs associated with the company's manufactured gas plants in Rochester and Albert Lea. We affirm.

## FACTS

Interstate Power Company (IPW) is a gas and electric utility that generates, transmits, and distributes natural gas and electric energy in southern Minnesota and parts of Iowa and Illinois. Approximately 20% of IPW's gas sales are to Minnesota customers.

Before providing natural gas to their customers, IPW and its predecessors provided manufactured gas. Manufactured gas plants (MGPs) operated in the United States from the early 1800's until the 1930's, when they were replaced by natural gas plants. MGPs produced combustible gas from coal. The coal tar waste was stored in on-site disposable lagoons or underground wells or pits. In the 1980's, the waste from the process of manufacturing gas was deemed hazardous. The Environmental Protection Agency began requiring the cleanup of waste that former MGPs left during the 1800's and early 1900's.

The MGPs in this case are located in Rochester and Albert Lea. They were owned and operated at one time by IPW and its predecessors. IPW and its predecessors provided manufactured gas from the Albert Lea MGP from 1903 until 1933, when the MGP was replaced by a natural gas plant. One part of the former MGP was used as a garage and warehouse and then sold, but another part is still owned by IPW and is currently vacant. IPW stored fuel oil on this site until 1978. IPW currently provides natural gas to customers in Albert Lea.

IPW and its predecessors provided manufactured gas from the Rochester MGP from 1888 until 1932, when IPW lost its gas franchise. IPW has never provided natural gas to Rochester customers. IPW initially leased the MGP site to Minnesota Natural Gas, and ultimately sold the site to Peoples Natural Gas in 1948.

As the previous owner and operator of the two sites, and the current owner of part of the Albert Lea site, IPW is legally required to cleanup the sites. It is undisputed by the parties that the cleanup cost determined by IPW is reasonable and prudent. The dispute lies in determining who should pay for the cleanup; IPW and its ratepayers or IPW alone.

In May 1995, IPW filed a request for a general rate increase reflecting the cost of cleaning up several MGP sites in Minnesota, including the Rochester and Albert Lea sites. The Department of Public Service and the Office of the Attorney General (the relators) contested recovery of the cleanup costs for the Albert Lea and Rochester sites, arguing that natural gas customers received no benefit from these MGPs and should not contribute to their cleanup. The Minnesota Public Utilities Commission (MPUC) determined that the cleanup costs may be included in gas customer rates because the two sites were "used and useful" at the time of pollution. The relators requested reconsideration by the MPUC of the treatment of the costs. The requests were denied and this certiorari appeal followed.

## ISSUES

1. Did the MPUC act in a legislative or in a quasi-judicial capacity in deciding to allocate recovery of cleanup costs to current natural gas ratepayers for MGP sites that were subsequently converted to natural gas sites or are no longer in use?

2. Was the MPUC's construction of "utility property used and useful," as including property that was "used and useful" at the time of pollution in excess of its statutory authority?

3. Was the MPUC's decision that the facilities were "used and useful" at the time of pollution supported by substantial evidence?

## ANALYSIS

### 1. Legislative and Quasi–Judicial Capacity

The MPUC's decision to allow IPW to recover the MGP cleanup costs from current natural gas ratepayers is an exercise of both legislative and quasi-judicial functions:

> [I]n the exercise of the statutorily imposed duty to determine whether the inclusion of the item generating the claimed cost is appropriate, or whether the ratepayers or the shareholders should sustain the burden generated by the claimed cost, **the MPUC acts in both a quasi-judicial and a partially legislative capacity.** To state it differently, in evaluating the disputes in the typical rate case the accent is more on the inferences and conclusions to be drawn from the facts (i.e., amount of claimed costs) rather than on the reliability of the facts themselves.

*In re Petition of Northern States Power Co.,* 416 N.W.2d 719, 722–23 (Minn.1987) (emphasis added).

When reviewing the MPUC's legislative and quasi-judicial functions, this court applies two different standards:

> (a) When the [MPUC] acts in a judicial capacity as a factfinder, receives evidence in order to make factual conclusions, and weighs that evidence as would a judge in a court trial, it will be held on review to the substantial evidence standard.
>
> (b) When the [MPUC] acts in a legislative capacity as in rate increase allocations, balancing both cost and noncost factors and making choices among public policy alternatives, its decision will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence.

*Hibbing Taconite Co. v. Minnesota Pub. Serv. Comm'n.,* 302 N.W.2d 5, 9 (Minn.1980). We conclude that the MPUC acted in its legislative capacity when it determined recovery would be allowed if the property was "used and useful" when the pollution occurred. We conclude the MPUC was acting within its quasi-judicial capacity when it found there was evidence in the record that the property was, in fact, "used or useful" when pollution occurred. Therefore, we review this case under both standards of review.

## 2. Statutory Authority

The MPUC derives its statutory authority to determine rates from Chapter 216:

The [MPUC], in the exercise of its powers * * * to determine just and reasonable rates for public utilities, shall give due consideration to the public need for adequate, efficient, and reasonable service and to the need of the public utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provision for depreciation of its utility property **used and useful** in rendering service to the public * * *.

Minn.Stat. § 216B.16, subd. 6 (1996) (emphasis added).

▮ The determination of whether the MPUC has exceeded its statutory authority raises questions of law that are subject to *de novo* review. *Minnegasco v. Minnesota Pub. Utils. Comm'n,* 549 N.W.2d 904, 907 (Minn.1996).

▮ Relators challenge the MPUC's determination that the subject properties were "used and useful in rendering services to the public." Minn.Stat. § 216B.16, subd. 6 (1996). We conclude the MPUC's definition, "used and useful at the time of the pollution," did not exceed its statutory authority.

Relators argue that for a facility to be "used and useful," the facility must be currently "in service." Relators argue the MPUC erred as a matter of law in permitting the cleanup costs to be included in IPW's rate base because the properties at issue here have not been found to be "in service" for benefit of the state's natural gas ratepayers. Relators rely on *Senior Citizens Coalition v. Minnesota Pub. Utils. Comm'n,* 355 N.W.2d 295 (Minn.1984), to support this proposition. In *Senior Citizens Coalition,* the supreme court held that a utility could recover the costs of building recreational facilities required by federal regulations. *Id.* at 300–01. That case did not specifically address the cleanup of MGPs from prior use and the allocation of those costs to current gas customers.

▮ Under normal ratemaking policy, a utility is entitled to recover necessary, on-going expenses incurred in the business of providing utility service. *See In re Petition of Northern States Power Co.,* Docket No. G 002/GR–85–108 at 22, (MPUC Dec. 30, 1985). Ideally, ratepayers should pay anticipated cleanup costs arising while a facility is in use. *Id.* at 22. However, waste cleanup may not have been necessary while the facility was in use, and the need for such cleanup is more likely to occur after the facility is retired from use. *Id.* In the 1980's, the waste from the process of manufacturing gas was deemed hazardous. The Environmental Protection Agency began requiring the cleanup of waste that former MGPs left during the 1800's and early 1900's. It was not possible for the then ratepayers to pay the cleanup costs because the wastes were not determined to be hazardous until 1980. The MPUC has balanced the need to set reasonable rates for the ratepayers with the need to clean up hazardous wastes. We conclude that the MPUC did not exceed statutory authority in its construction of "used and useful."

## 3. Substantial Evidence

▮ No one disputes that these properties were "used and useful" at the time of pollution. The record contains substantial evidence to support the MPUC's determination that the facility was "used and useful" at the time of the pollution. IPW and its predecessors provided manufactured gas from the Albert Lea MGP from 1903 until 1933, when the MGP was replaced by a natural gas plant. One part of the former MGP was used as a garage and warehouse and then sold, but another part is still owned by IPW and is currently vacant. IPW stored fuel oil on this site until 1978. IPW currently provides natural gas to customers in Albert Lea. IPW and its predecessors provided manufactured gas from the Rochester MGP from 1888 until 1932, when IPW lost its gas franchise.

The record reveals that manufactured gas was replaced by natural gas. There was a change in the product. Gas utility service continued to ratepayers. The coal tar waste from the manufacturing MGP was stored in on-site disposable lagoons or underground

wells or pits. No party disputes the appropriateness of these costs.

### DECISION

Because we agree that the cleanup costs resulted from providing a gas utility service the MPUC appropriately concluded that these cleanup costs should be recovered from current ratepayers and because the MPUC's decision was supported by substantial evidence and was not beyond its statutory authority, we affirm.

**Affirmed.**