## In the Matter of the REQUEST OF INTERSTATE POWER COMPANY FOR AUTHORITY TO CHANGE ITS RATES FOR GAS SERVICE IN MINNESOTA.

### Minnesota DEPARTMENT OF PUBLIC SERVICE, Appellant,

and

### Hubert H. Humphrey III, Minnesota Attorney General, Appellant.

v.

### MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent,

and

### Interstate Power Company, Respondent.

### No. C1–96–1558.

Supreme Court of Minnesota.

Jan. 8, 1998.

Brent Vanderlin, Asst. Atty. Gen., for appellant Minn. Dept. of Public Service.

Margie Hendriksen, Asst. Atty. Gen., for Public Utilities Com'n.

Eric Swanson, Asst. Atty. Gen., for appellant Hubert H. Humphrey III.

Michael Bradley, Moss & Barnett, P.A., Minneapolis, Christopher B. Clark, Interstate Power Co., Dubuque, IA, for respondent Interstate Power Co.

## OPINION

STRINGER, Justice.

At issue here is whether the Minnesota Public Utilities Commission (MPUC) had the authority to order rate recovery from Interstate Power Company's (Interstate) current natural gas customers for cleanup costs of two former manufactured gas plant sites not currently used or useful for the provision of utility service. The Administrative Law Judge (ALJ) recommended that Interstate be allowed to recover one-half of the cleanup costs from its current natural gas customers. The MPUC affirmed the findings and conclusions of the ALJ, but modified the recommendation to provide full recovery of the cleanup costs for Interstate. The court of appeals affirmed the MPUC order, rejecting appellants' argument that "used and useful" applied to the time of the rate case rather than the time of pollution, and held that the MPUC acted in a legislative capacity and did not exceed its statutory authority when it determined that rate recovery was allowed if the property was used and useful at the time of pollution. The court of appeals also held that the MPUC acted in a quasi-judicial capacity when it determined that the sites at issue were, in fact, used and useful at the time of pollution, and that there was substantial evidence supporting that determination. *In re Request of Interstate Power Co. for Authority to Change its Rates for Gas Service,* 559 N.W.2d 130 (Minn.App.1997). We affirm the court of appeals.

Manufactured gas is a form of energy that was used from the late 1800s until the 1930s, when natural gas became available. It was produced by the incomplete combustion of coal and sometimes oil to produce a synthetic combustible gas that was piped from the plant site to customers for use in heating, cooking, and lighting. The manufacturing process produced residual products, including coal tar, that were frequently deposited in on-site lagoons or underground wells or pits—a method of disposal considered safe at the time. In the early 1980s the Environmental Protection Agency declared this coal tar waste a hazardous substance and began requiring current and former owners of the sites to clean up the contamination. In the early 1990s, the Minnesota Pollution Control Agency (MPCA) determined Interstate to be at least partially responsible for the cleanup of five manufactured gas plant sites in Minnesota, including plant sites in Albert Lea and Rochester, under the Comprehensive and Environmental Response Compen-

sation and Liability Act (CERCLA), 42 U.S.C. § 9601–9675 (1996), the Superfund Amendments and Reauthorization Act (SARA), *id.*, and the Minnesota Environmental Response and Liability Act (MERLA), Minn.Stat. Ch. 115B (1996). At issue here are the cleanup costs of Interstate's former manufactured gas plant sites in Albert Lea and Rochester, Minnesota.

The Albert Lea plant began manufacturing gas in 1903 under a different owner. Interstate acquired the plant in 1925 and manufactured gas at that site until 1933. When natural gas became available, Interstate ceased production of manufactured gas. The site was thereafter used as a vehicle maintenance garage and transformer repair facility until 1950, and then from 1950 to 1978 as a fuel oil storage yard for Interstate's adjacent electric plant. Part of the Albert Lea site where the manufactured gas storage containers were located was sold in 1984, but Interstate continues to own the remaining property and currently uses it as part of its underground gas and utility lines distribution system. In 1992, the MPCA concluded that the soil and groundwater at the Albert Lea site were contaminated and cleanup was required. Interstate is in the early stages of the cleanup. It has incurred investigation costs of $494,735 through March 1995; future cleanup costs are unknown. Interstate provides natural gas utility service to the Albert Lea area.

The manufactured gas plant in Rochester began operating in 1888 and Interstate purchased the company in 1925. When natural gas became available in Rochester in 1932, Interstate ceased manufacturing gas at the site and leased the gas plant and property to Minnesota Northern Natural Gas. In 1948, Interstate sold the plant and land to Peoples Natural Gas, the current owners of part of the land; the City of Rochester owns the remaining property. After soil contamination was discovered in the early 1990s and cleanup was ordered, Interstate, Peoples Natural Gas, and the City of Rochester executed a series of agreements to share the costs. Cleanup of the Rochester site is near completion, and Interstate has incurred costs of $5,422,363 through March 1995. Inter-

state no longer provides any utility service in Rochester.

As a public utility, Interstate's electric and gas rates are regulated by the MPUC under Minn.Stat. Ch. 216B (1996). In reviewing rate changes, the MPUC's charter is broadly defined in terms of balancing the interests of the utility companies, their shareholders, and their customers to ensure that rates are "just and reasonable." Minn.Stat. § 216B.16, subd. 6.

In July 1994, Interstate filed a petition with the MPUC seeking approval of deferred accounting for the cleanup costs associated with the Rochester and Albert Lea manufactured gas plants. A deferral allows the utility to seek rate recovery of the deferred expenses in its next gas and electric rate cases. The MPUC granted the petition deferring the accounting for the cleanup costs, but denied recovery of the cleanup costs from Interstate's electric customers, stating that the costs "are associated with the provision of gas service [and] [t]here is no nexus between costs of remediation of MGP [manufactured gas plant] sites and the provision of electric service." The MPUC allowed Interstate to defer the cleanup costs and request rate recovery from gas customers in its next general gas rate case.

On May 1, 1995, Interstate filed a general rate case with the MPUC requesting a rate increase of $2,365,280, 25 percent ($594,898) attributable to the mandated cleanup of the two former manufactured gas plants. The Department of Public Services and the Office of the Attorney General (Appellants) intervened in the case and argued against rate recovery for the former manufactured gas plant cleanup on two grounds: first, the sites must be used and useful at the time of the rate case, not the time of pollution; second, there was an insufficient nexus between manufactured gas and natural gas to support the cost recovery against the current natural gas customers.

The Administrative Law Judge (ALJ) held hearings on Interstate's general rate case and on January 16, 1996, the ALJ filed his final report and recommended that the MPUC allow Interstate to recover the clean-

up costs under Minn.Stat. § 216B.16, subd. 6, which provides:

> The commission, in the exercise of its powers under this chapter to determine just and reasonable rates * * * shall give due consideration to the public need for adequate, efficient, and reasonable services, and to the need of the public utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provision for depreciation of its utility *property used and useful in rendering service to the public,* and to earn a fair and reasonable return upon the investment in such property.

*Id.* (emphasis added). The ALJ found that the cleanup costs were mandated by the MPCA and they were reasonable and prudent, findings not now contested by appellants. The ALJ concluded however, that the sites need only be "used and useful" in providing utility service *at the time of pollution* and rejected the appellants' argument relating to nexus, stating that a distinction between manufactured gas and natural gas would be "contrary to Commission precedent and * * * common sense," noting that to the customer, gas is gas, whether manufactured or of natural origin. The ALJ recommended splitting the cleanup costs between the shareholders and customers, resulting in $2,470,087 for each group, to be amortized over 15 years with an 8 percent interest recovery on the future unpaid cost recovery.

The MPUC adopted the findings of the ALJ in its February 29, 1996 order. The MPUC concluded that Interstate had met the standard for recovery of the cleanup costs: the expenses were prudent and reasonable and were required by the MPCA and the property was used and useful in providing utility service at the time of pollution. *See Northern States Power Co.,* Docket No. G–002/GR–85–108 (Dec. 30, 1985); *Minnegasco,* Docket No. G–008/GR–92–400 (May 3, 1993) and Docket No. G–008/GR–93–1090 (Oct. 24, 1994); and *Peoples Natural Gas Co.,* Docket No. G–011/GR–92–132 (June 11, 1993). The MPUC rejected however, the

ALJ's recommendation of cost sharing and held that Interstate could recover 100 percent of the costs from the customers because there was no evidence of imprudence or fault on the part of the company. The MPUC also reduced the amortization period to 10 years and provided for no interest recovery on the unpaid future cost recovery.[1]

The court of appeals affirmed the MPUC, holding that the MPUC acted in both a legislative and a quasi-judicial capacity in reaching its determination: when the MPUC determined that rate recovery would be allowed if the property was used and useful at the time of pollution, it was acting in a legislative capacity; when the MPUC determined that the properties at issue were, in fact, used and useful at the time of pollution, it was acting in a quasi-judicial capacity. Applying the standard of review for the legislative action, the court of appeals determined that the MPUC had not exceeded its statutory authority, and applying the standard of review for the quasi-judicial action, the court of appeals reviewed the record and concluded that the MPUC's decision was supported by substantial evidence. *In re Request of Interstate Power Co.,* 559 N.W.2d at 134.

On review here, we must determine whether the MPUC's decision to allow rate recovery for the cleanup costs of former manufactured gas plant sites is within its statutory authority. Our standard of review is set forth in Minn.Stat. § 14.69 (1996), which provides that the reviewing court may reverse or modify an agency decision if the administrative "finding, inferences, conclusion or decisions are: * * * (b) [i]n excess of the statutory authority or jurisdiction of the agency; or * * * (d) [a]ffected by other error of law; or (e) [u]nsupported by substantial evidence in view of the entire record as submitted * * *." As the court of appeals properly noted, the legislature has granted the MPUC both legislative and quasi-judicial powers to exercise its statutory authority, and thus when the MPUC acts in a legislative capacity, the standard of review is

---

1. Appellants petitioned for reconsideration. On July 2, 1996, the MPUC issued an order affirming the February 29, 1996 order stating that the MPUC "remain[ed] convinced that its decision allowing recovery of MGP [manufactured gas plant] cleanup costs was based on clear precedent, sound reasoning, and consistent Commission policy."

whether the MPUC exceeded its statutory authority; in contrast, when the MPUC acts in a quasi-judicial capacity, the standard of review is the substantial evidence test. *St. Paul Area Chamber of Commerce v. Minn. Pub. Serv. Comm'n.*, 312 Minn. 250, 251 N.W.2d 350, 358 (1977).

The MPUC acts in a legislative capacity when it is "balancing both cost and noncost factors and making choices among public policy alternatives." *St. Paul Area Chamber of Commerce*, 251 N.W.2d at 358. Here, the MPUC's responsibility was to balance the needs of the customers and the shareholders, the risk to the fiscal integrity of the utility, the fairness of current charges for past environmental harm, the prudence and reasonableness of the utility's actions, and the societal goal of environmental remediation—clearly policy determinations to be resolved by the MPUC acting in a legislative capacity.[2] Our review is under the standard of review for legislative action, affirming the MPUC's decision "unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence." *Id.*

We consider first appellants' argument that the MPUC exceeded its statutory authority when it applied the "used and useful" standard to the time the pollution occurred rather than to the time of the rate case. Appellants argue that the MPUC exceeded its statutory authority by failing to apply the "used and useful" standard to the time of the rate case, citing *Senior Citizens Coalition v. Minnesota Public Utilities Commission*, 355 N.W.2d 295 (Minn.1984). In *Senior Citizens*, we held that the MPUC erroneously excluded from Minnesota Power & Light's rate base the cost of recreational facilities that the Federal Energy Regulation Commission required as a condition of issuing permits for hydroelectric projects on navigable waters. *Id.* at 301. In holding that the recreational facilities were used and useful, we examined cases from other jurisdictions and concluded that "[u]nder general principles of utility law, the 'used and useful' standard simply requires (1) that the property be 'in service,' and (2) that it be 'reasonably necessary' to the efficient and reliable provision of utility service." *Id.* at 300 (citations omitted).

The important distinction between the *Senior Citizens* case and the case at hand however, is that the issue of recovery of operating expenses incurred in connection with the cleanup is based on entirely different principles than those to be considered in determining whether the recreational facilities in *Senior Citizens* should be included in the rate base. Consideration of what property is included in the rate base is an essential step in determining what is an appropriate return on the asset base; on the other hand whether to permit the recovery of an item of expense, while it certainly affects the rate of return, is essentially a policy question of whether the shareholders or the customers should bear the cost. Because of this important difference, *Senior Citizens* is not determinative of the result in this case.[3]

Here, the MPUC treated Interstate's cleanup costs as an operating expense, and permitted Interstate to recover the cleanup costs from the natural gas customers but did not allow the investors to earn either interest or a return on the costs in the rate base. The MPUC exercised its policymaking authority to examine the facts and circumstances of the coal tar pollution and determined that it was appropriate to allow recovery of the cleanup costs from the natu-

---

**2.** The legislature empowered the MPUC to act in a legislative capacity both in its factfinding as well as policymaking responsibilities. The enabling statute provides that the commission "may make such investigations and determinations * * * as the legislature itself might make * * * and thus it has a very broad factfinding as well as policymaking jurisdiction." Minn.Stat. § 216A.05, subd. 1 (1996).

**3.** The distinction between rate base items and operating expenses was recognized in *Northern States Power Co.*, Docket No. G–002/GR–86–160 (Jan. 27, 1987). The MPUC allowed NSP to amortize as an operating expense its total cleanup costs of a former manufactured gas plant site in Faribault, but disallowed inclusion of any portion as a rate base item, stating that the "customers should not be required to pay a return on cleanup costs which are providing no current benefit to them"—clearly recognizing the distinction between an item of expense and an item to be included in the rate base.

ral gas customers if the property was used and useful for utility service at the time of pollution. In doing so, the MPUC considered the importance of environmental cleanup and balanced the needs of the customers for reliable utility service with those of the shareholders for a fair return on their investment—a balancing of interests "the legislature itself might make." *See supra* n. 2. We conclude that when the MPUC acted in its legislative capacity in making a policy decision that the manufactured gas plant sites need only be used and useful at the time of pollution to meet the statutory requirement of section 216B.16, subdivision 6, it did not exceed its statutory authority.

We turn next to appellants' argument that it is unfair to require Interstate's natural gas customers to pay for cleanup of the manufactured gas plant sites because manufactured gas and natural gas are different products and different services. Certainly, the ideal pool of customers would be the manufactured gas customers, but obviously assessing charges against consumers of a service that ceased to exist over 60 years ago is not possible. As an alternative, Interstate initially proposed charging the cleanup costs to both its gas and electric customers, but the MPUC rejected this allocation because the "factual nexus [was] too strained to support allocating cleanup costs to electric customers."[4] The MPUC agreed with the ALJ that both manufactured and natural gas are combustible, gaseous substances delivered to customers through pipes, and the fact that manufactured gas was produced at a plant site and natural gas is piped from natural gas fields is "just a matter of science and economics."[5] Moreover, the two sites have been used in connection with natural gas service more than any other use: after Interstate ceased production of manufactured gas, the Albert Lea site was used for a vehicle maintenance garage and underground pipelines for natural gas utility service in that area; likewise, the Rochester site was leased to a natural gas company and used for the provision of natural gas utility service. The MPUC concluded that "both manufactured gas and natural gas are simply gas utility service."

While there is merit to appellants' argument that it is inequitable to require current natural gas customers to pay the cost of cleaning up environmental damage inflicted in the process of manufacturing gas over 60 years ago, in the absence of the ability to charge these costs to the manufactured gas customers, the MPUC was left with the alternative of rejecting the cost recovery in its entirety—potentially causing a financial crisis for Interstate—or permitting the cost recovery from the natural gas customers over a period of 10 years without interest. We conclude that while its decision to permit the cost recovery through a rate increase was not a perfect solution, it was not unfair or unreasonable, nor did it exceed the MPUC's statutory authority. Manufactured gas and

4. The MPUC disallowed the allocation in the order approving Interstate's request to defer the cleanup costs and request recovery in its following rate case, stating that electricity uses a "completely different generation, transmission, and distribution system" and "wholly different fixtures and appliances" are required to use electricity instead of manufactured gas. The Department of Public Service also argued that allocation to electric customers is unfair to other gas companies, such as Minnegasco and Peoples, who do not have electric customers who could help pay for cleanup of manufactured gas plant sites. Additionally, treating a utility's gas and electric operations separately enables accurate accounting and cost of service analysis, and advances just and reasonable ratemaking. *In re Request by Interstate Power Co. for Deferral of Expenses Associated with Former Manufactured Gas Plants*, Order Denying Reconsideration, Docket No. G–001/M–94–633 (August 21, 1995).

5. There was fragmentary and conflicting evidence presented to the ALJ regarding the transition from manufactured gas to natural gas. Some testimony suggested that natural gas replaced manufactured gas as an energy source, but other testimony suggested that electricity replaced manufactured gas for many uses. One witness testified that manufactured gas was used for heating, cooking, and lighting, and natural gas is now used for the same purposes; another witness testified that natural gas is used primarily for heating, and that before natural gas was available, coal and oil, not manufactured gas, were used for heating. Yet another witness testified that electricity, not natural gas, has supplanted manufactured gas in lighting and cooking.

natural gas are not so fundamentally different as to make it illogical to permit cleanup cost recovery from the natural gas customers, and the MPUC did not exceed its statutory authority by concluding that Interstate's current natural gas customers had a sufficient nexus to the former manufactured gas plant sites.

 Finally, we turn to appellants' argument as to the adequacy of the evidence in the record to support the MPUC finding that the manufactured gas plants were actually "used and useful" at the time of pollution. We agree with the court of appeals that the MPUC acted in a quasi-judicial capacity as to this issue. The substantial evidence test applies, and it is met when we find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 825 (Minn.1977). We also consider "whether the agency has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *Northern States Power Co.,* 416 N.W.2d 719, 724 (Minn. 87–192) (quoting *Minnesota Power & Light Co. v. Minn. Pub. Utils. Comm'n,* 342 N.W.2d 324, 330 (Minn.1983)). Interstate offered uncontradicted evidence that the sites were owned and operated for the production of manufactured gas from 1925 to 1933 as to the Albert Lea site, and from 1925 to 1932 as to the Rochester site. The MPUC's determination that the sites were used and useful at the time of pollution is the only reasonable conclusion from the evidence.

In summary, we conclude that the MPUC acted in a legislative capacity when it allowed rate recovery for the cleanup costs of Interstate's former manufactured gas plant sites as property "used and useful" at the time of pollution, and it did not exceed its statutory authority in doing so; it acted in a quasi-judicial capacity when it determined that the former manufactured gas plants were actually used and useful at the time of pollution, and its conclusion was reasonable based on the record. We therefore affirm the court of appeals and the MPUC order allowing Interstate to recover cleanup costs for former

manufactured gas plant sites from its natural gas customers.

Affirmed.