**In the Matter of the REQUEST FOR SERVICE IN QWEST'S TOFTE EXCHANGE.**

**No. C2-02-2079.**

Court of Appeals of Minnesota.

July 22, 2003.

---

392

Mike Hatch, Attorney General, Karen Finstad Hammel, Assistant Attorney General, Paul, MN, for respondent MPUC.

Jason D. Topp, Qwest Corporation, Minneapolis, MN, and Larry D. Espel, John M. Baker, William P. Hefner, Greene Espel, P.L.L.P., Minneapolis, MN, for relator Qwest Corporation.

Considered and decided by STONEBURNER, Presiding Judge, FORSBERG, Judge, and HUSPENI,

Judge.*

## OPINION

FORSBERG, Judge.*

Relator Qwest Corporation (Qwest) brings this certiorari appeal challenging orders issued by respondent Minnesota Public Utilities Commission (MPUC), that require Qwest to construct facilities to serve approximately 100 persons who live within the Tofte exchange area and to bear most of the cost of providing those services. Qwest asserts that the MPUC's decisions disregard existing tariff provisions and are unsupported by the record. During the pendency of this appeal, Qwest requested a stay of the proceedings, which we granted in part in an order dated June 13, 2003.

Because the MPUC's decision to require Qwest to bear most of the costs of providing service to these petitioners is unsupported by substantial evidence in the record and fails to adequately consider the tariff provisions that allow Qwest to recover a sufficient amount of its construction charges to constitute a prudent investment, we reverse and remand for further proceedings.

## FACTS

On May 31, 2000, Robert Tyson and other residents within the Tofte exchange area filed a complaint with the MPUC requesting an investigation into Qwest's failure to provide telephone service to their residences. *See* Minn.Stat. § 237.081, subd. 1a (2002) (providing that MPUC "shall investigate the matters raised" in complaint made against telephone company that "service is inadequate or cannot be obtained"). Throughout this

investigation, Qwest has not disputed that the MPUC has the authority to require Qwest to provide services to these petitioners. Rather, Qwest challenges the allocation of costs and argues that it is entitled to charge the petitioners line extension charges and excess construction charges under the terms of its tariff, known as the Exchange and Network Services Tariff (tariff). This tariff governs Qwest's local exchange activities in Minnesota.

Section 4.1.B.16 of the tariff deals with line extension charges and provides that "[c]ustomers * * * receive a free 700–foot allowance in cable installation starting at the nearest Network Facility," defined as an "existing facility which may serve more than one customer." After this 700–foot allowance, customers may be charged a fixed, nonrecurring fee of $55 and $.51 per foot for the first line and $.04 for each additional line.

Section 4.1.B.1. of the tariff deals with excess construction charges and provides:

> Where the equipment or facilities, or both, required to provide a requested service are not available, and their provision entirely at the expense of the Company would not, in the opinion of the Company, constitute a prudent investment, construction * * * charges * * * may apply, in addition to regularly applicable charges * * * to that part of the cost of the required equipment and facilities which would not constitute a prudent investment if the requested service were furnished subject solely to the rates, charges and initial service periods specified in the appropriate tariffs and/or price lists.

Although Qwest may determine whether the provision of requested services "entire-

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

ly at [its own] expense" would constitute a "prudent investment," the assessment of any excess or special construction charges must be approved by the MPUC. *See id.;* Minn. R. 7812.0600, subp. 4 (2001) ("An LSP [local service provider] may assess special construction charges approved by the commission if existing facilities are not available to serve the customer.").

In this case, Qwest estimated that individual line extension charges would total approximately $1.2 million and that excess construction charges would total approximately $1.5 million. These estimates are based on the distance from the end of Qwest's existing line near Highway 61 to each individual petitioner's residence. To recover all of these costs, the charges per petitioner would range from approximately $5,000 to $45,000, with an average charge of approximately $35,000 per petitioner. These charges do not include an estimated additional $500,000 to $1 million to provide service sufficient to support Internet access, which was also requested by the petitioners.

In connection with its investigation of petitioners' complaint, the MPUC received comments, met with interested parties, and toured the area in question with representatives from Qwest, the Minnesota Department of Commerce (DOC), and the Residential and Small Business Utilities Division of the Office of the Attorney General (RUD–OAG). The MPUC heard arguments on May 20, 2002.

At the hearing, Qwest conceded that it should be required to make some reasonable investment to help defray the costs to each customer. MPUC commissioners questioned Qwest regarding any recent investments in the Tofte exchange area and what Qwest would consider to be a reasonable investment; these questions were left largely unanswered.

By order issued June 21, 2002, the MPUC ordered Qwest to extend its network facilities to serve the Tofte residents. The MPUC waived the 700–foot exemption in the tariff and only permitted Qwest to charge each resident the $55 non-recurring flat fee and $.51 per foot from the reasonably extended network facility, which it defined as the "point where Qwest's service line passes the property of a customer wanting service (assumed to be the local access road)." The MPUC's order further required Qwest to "provide service that will allow minimum data transmission rates of 14.4 kbps."

Qwest moved for reconsideration, requesting that it be given two weeks to submit a proposal that would take into account its obligation to make a reasonable investment to extend its network. The commissioners discussed at length what would be a reasonable "demarcation" point for Qwest to extend its network before the tariff charges would begin, noting the lack of cost data in the record. The MPUC granted Qwest's request and issued an order specifically instructing Qwest to provide information "as to the cost to individual property owners, as to how total costs would be divided between new customers, [and] as to Qwest's participation in the cost of providing such service." The MPUC further ordered that Qwest determine the number of people in the area likely to accept service at its proposed price.

Qwest submitted a proposal on September 6, 2002, which it characterized as a "conditional settlement only." It proposed to construct the facilities necessary to extend service to the petitioners and their neighbors for an initial nonrecurring fee of $3,600 per lot, but only if at least 75% of the currently eligible households accepted that rate.

In a third order issued October 31, 2002, the MPUC rejected Qwest's proposal be-

cause it "did not demonstrate with appropriate cost support that the pricing proposed was fair and reasonable." The MPUC generally reaffirmed its original order, clarifying that Qwest "shall extend its facilities along all public, private and forest service roads serving the customers" and that the "customers shall be charged a $55 installation fee and a $0.51 per foot charged from the newly-installed facilities to their homes." Qwest estimates that under the MPUC's orders, it will recoup approximately $10,000, or less than .5% of the costs necessary to provide the service ordered.

### ISSUES

1. What is the appropriate standard of review of the MPUC's orders in this case?

2. Does the record support the MPUC's decision to require Qwest to extend its network facilities, to provide service at 14.4 kbps, and to bear most of the costs?

3. Are the MPUC's orders confiscatory?

### ANALYSIS

#### I.

■ The legislature has granted the MPUC both legislative and judicial powers. *In re Request of Interstate Power Co. for Auth. to Change its Rates for Gas Serv.*, 574 N.W.2d 408, 412 (Minn.1998). When the MPUC acts in a legislative capacity, the standard of review is whether it exceeded its statutory authority; when the MPUC acts in a quasi-judicial capacity, the standard of review is the substantial evidence test. *Id.* at 412–13. The MPUC characterizes this matter as quasi-legislative, like a ratemaking case or a request to "establish just and reasonable rates and prices" under Minn.Stat. § 237.081, subd. 4 (2002). Qwest characterizes this case as quasi-judicial, to which the substantial evidence test applies. *See Cable Communications Bd. v. Nor–West Cable Communications P'ship*, 356 N.W.2d 658, 668 (Minn. 1984) (definition of substantial evidence includes more than some or any evidence or evidence considered in its entirety). Because this case involves the application of specific facts to the tariff provisions and raises policy questions regarding the approval of the line extension charges and excess construction costs proposed by Qwest, we conclude that the MPUC is required to act in both capacities. We thus review this case under both standards.

■ The parties also disagree on the burden of proof. Qwest claims that it merely sought to apply charges in accordance with its tariff and that the burden should have been placed on the petitioners to show that the tariff rates were inapplicable or should be changed. *In re Minn. Pub. Utils. Comm'n (Northwestern Bell Telephone Co.)*, 365 N.W.2d 341, 343 (Minn.App.1985) (telephone company does not have burden of proof to show rate change is just and reasonable where changes are initially proposed by other parties), *review denied* (Minn. May 31, 1985). The MPUC, on the other hand, asserts that the burden was properly placed on Qwest to establish the reasonableness of its proposed charges. *See In re Deregulation of Installation & Maintenance of Inside Wiring*, 420 N.W.2d 650, 657 (Minn.App.1988) (telephone company has burden to show that existing rates are reasonable or that rate change is just and reasonable), *review denied* (Minn. May 16, 1988). The initial burden may have been on the petitioners to prove inadequacy of service, but the issue here involves the allocation of costs under the existing tariffs. We conclude that the burden of proving that its proposed rates are reasonable

is more properly placed on Qwest. *See* Minn.Stat. § 237.28 (2002) ("In any investigation, action or proceedings arising under, or growing out of, an action initiated by the commission upon its own motion, the burden of proof shall be upon the telephone company to establish the reasonableness of the existing rates.").

## II.

■ Qwest does not challenge the MPUC's authority requiring it to provide telephone service to the individual property owners in the Tofte exchange area. Rather, Qwest argues that the MPUC acted unlawfully by refusing to apply and follow the plain terms of the governing tariffs and by assessing the majority of the costs to Qwest. We agree.

Investigations of complaints by the MPUC are governed by Minn.Stat. § 237.081 (2002). Once the MPUC finds that

> (1) a service that can be reasonably demanded cannot be obtained, (2) that any rate, toll, tariff, charge, or schedule * * * affecting or relating to the production, transmission, delivery, or furnishing of telephone service * * * is in any respect unreasonable, insufficient, or unjustly discriminatory, or (3) that any service is inadequate, the commission shall make an order respecting the tariff, regulation, act, omission, practice, or service that is just and reasonable and, if applicable, shall establish just and reasonable rates and prices.

*Id.*, subd. 4. While the MPUC must respect the terms of the tariff, it also must insure that any proposed charges are just and reasonable.

With respect to the line extension charges set out in section 4.1.B.16.c. of the tariff, the MPUC concluded that running a single line from each residence to the nearest existing facility, as Qwest proposed, is not a reasonable means of providing service in this case, given the "clustering" of the residences around a small number of lakes. The MPUC further concluded that because Qwest failed to reasonably deploy its network, it would be unreasonable to measure line extension charges from the nearest "existing facility" as provided by the line extension tariff. The MPUC reasoned that because Qwest's rates have been set over many years at levels that permitted it to recover its expenses to reasonably extend its network and because Qwest has not yet done so in its Tofte exchange, it now has a duty to extend its network.

The MPUC's reasoning tends to support its decision to require Qwest to extend its network into the Tofte exchange area because "existing facilities" are not available and because Qwest is required to incur some costs to reasonably extend its facilities as demand for service increases. But Qwest's failure to make investments in the Tofte area over the years does not necessarily support the MPUC's decision to require Qwest to bear most of the costs of now providing these services. Nor does the MPUC's reasoning support its decision to ignore the provisions of the tariff governing line extension and excess construction charges.

Where, as here, "the equipment or facilities, or both, required to provide a requested service are not available," the tariff allows Qwest to determine whether the provision of those services "entirely at [its own] expense" would constitute a "prudent investment." Tariff, § 4.1.B.1. But the MPUC must still approve any proposal to assess excess construction charges. *See* Minn. R. 7812.0600, subp. 4 (2001) ("An LSP [local service provider] may assess special construction charges approved by the commission if existing facilities are not available to serve the customer.").

Thus, in order to make a reasoned decision regarding approval of excess construction charges, the MPUC properly required Qwest to provide cost data to support its determination that provision of services here would not be a prudent investment. However, the mere fact that Qwest estimated that it will spend over $2 million to provide service for these 100 petitioners does not necessarily render this investment imprudent. Moreover, Qwest conceded that the entire cost of construction should not be placed on the petitioners and that it should be required to make some reasonable investment. While the MPUC properly rejected Qwest's proposal because it failed to include supporting cost data that would indicate the proposal was fair and reasonable, we are nonetheless left with questions that can only be answered by a remand to enable Qwest and the MPUC to revisit the issues, to provide sufficient evidence to support or refute the positions taken by each, and to ultimately reach a reasonable solution that would best serve the interests of the petitioners, Qwest, and the MPUC.

On remand, Qwest must submit a proposal and provide data from which a determination can be made about how much of the costs need to be recovered to make the investment prudent while remaining reasonable to the petitioners. The MPUC's rejection of any proposal made by Qwest must have some basis in the record. The MPUC cannot arbitrarily reject Qwest's proposal as it did previously.

Finally, the MPUC ordered Qwest to provide a grade of service to the Tofte residents sufficient to support Internet access at 14.4 kbps. Qwest claims that this requirement is arbitrary and capricious because the MPUC lacks authority to impose such a requirement. The MPUC responds that it merely required Qwest to provide a grade of service comparable to other outlying rural areas. On remand, any requirement that Qwest provide service at a particular data transmission speed and allocation of the cost of providing such service must also be supported by substantial evidence in the record.

In reaching our decision, we agree with Qwest that the MPUC's claim that Qwest can simply pass on to its existing customers the costs of expansion is unexplained and unsupported by evidence in the record. We also agree with Qwest that the principle of "universal service" does not justify the MPUC's decision to require Qwest to bear the majority of the costs of installing phone lines along "all public, private and forest service roads serving the customers" in the Tofte exchange area, particularly when the record lacks evidence to support that decision. *See In re MPUC's Initiation of Summary Investigation,* 417 N.W.2d 274, 287 (Minn.App. 1987) (reversing MPUC's order that required telephone company to provide free services to handicapped customers where this court found no evidence to show that the actual effect upon the company's rate of return was considered), *review denied* (Minn. Mar. 18, 1988 & Apr. 4, 1988).

■ We further reject the MPUC's claim that Qwest must exhaust all remedies under its alternative form of regulation (AFOR) plan, which contemplates a high level of investment for upgrading and expanding the telecommunications infrastructure. Since January 1, 1999, Qwest has operated under an AFOR plan, as permitted by Minn.Stat. §§ 237.76.772 (2002). In particular, the MPUC cites section IV.E.3.c. of the plan, which permits Qwest to petition for a rate change if it makes "[s]ubstantial financial impacts of investments in telecommunications infrastructure" that exceed a certain amount or are mandated by the government. At this

point, because neither party has shown that this section of the AFOR plan applies to the provision of services for the 100 or so petitioners in the Tofte exchange area, Qwest is not prohibited from seeking to assess fair and reasonable charges under the terms of its tariff.

## III.

■ Qwest argues that the MPUC's decision is illegal and unconstitutional because it denies Qwest reasonable compensation for the services it has been ordered to provide. According to Qwest, if it is not allowed to impose the line extension charges and excess construction costs upon the Tofte residents, then the rates in place are confiscatory. To show that a rate is confiscatory, a utility must show with specific information that reduced rates jeopardize the financial integrity of the company, either by leaving it with insufficient operating capital or by impeding its ability to raise future capital. *See Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310, 109 S.Ct. 609, 617, 102 L.Ed.2d 646 (1989) ("whether a particular rate is 'unjust' or 'unreasonable' will depend to some extent on what is a fair rate of return given the risks under a particular rate-setting system, and on the amount of capital upon which the investors are entitled to earn that return"). Given our decision to reverse and remand for further proceedings, we decline to address this issue. Until rates are in place, any constitutional challenge is premature. *See U.S. West Communications, Inc. v. Minn. Pub. Utils. Comm'n*, 55 F.Supp.2d 968, 990 (D.Minn. 1999) (stating that takings claims is not ripe for review until utility exhausts its state remedies, which include an opportunity to request readjustment of rates).

## DECISION

We reverse and remand the MPUC's orders, which limit Qwest's recovery of the cost of ordered expansion and direct the capacity of service to be provided. On remand, the MPUC must determine an allocation of costs that is fair and reasonable and that follows the tariff provisions, which allow Qwest to charge line extension and excess construction charges so as to make its provision of these services a prudent investment.

**Reversed and remanded.**