**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-0867**
**A23-0871**
**A23-1957**

In the Matter of the Application by Minnesota Power for
Authority to Increase Rates for Electric Service in Minnesota.

**Filed September 9, 2024**
**Affirmed in part, reversed in part, and remanded**
**Frisch, Judge**

Public Utilities Commission
File No. E-015/GR-21-335

Andrew P. Moratzka, Marc A. Al, Stoel Rives LLP, Minneapolis, Minnesota (for relator/respondent Large Power Intervenors)

Elizabeth M. Brama, Valerie T. Herring, Kodi J. Verhalen, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota; and

David R. Moeller, Minnesota Power, Duluth, Minnesota (for relator/respondent Minnesota Power)

Keith Ellison, Attorney General, Peter G. Scholtz, Travis Murray, Assistant Attorneys General, St. Paul, Minnesota (for respondent Office of the Minnesota Attorney General – Residential Utilities Division)

Keith Ellison, Attorney General, Susan C. Gretz, Jeffrey K. Boman, Assistant Attorneys General, St. Paul, Minnesota (for respondent Minnesota Public Utilities Commission)

Keith Ellison, Attorney General, Richard Dornfeld, Greg Merz, Assistant Attorneys General, St. Paul, Minnesota (for respondent Minnesota Department of Commerce)

Brian C. Edstrom, St. Paul, Minnesota (for respondent Citizens Utility Board of Minnesota)

Energy Cents Coalition, St. Paul, Minnesota (respondent)

Eric F. Swanson, Kyle R. Kroll, Christopher J. Cerny, Steven E. Vogel, Winthrop & Weinstine, P.A., Minneapolis, Minnesota (for amicus curiae Public Utility Group)

Considered and decided by Frisch, Presiding Judge; Ede, Judge; and Halbrooks, Judge.[*]

## SYLLABUS

1. A utility's mandatory contributions to its pension plan are an "expense[] of a capital nature" to which the Minnesota Public Utilities Commission must give "due consideration" in determining the utility's rate base under Minn. Stat. § 216B.16, subd. 6 (2022).

2. A decision of the Minnesota Public Utilities Commission that categorically and entirely excludes a prepaid pension asset from a utility's rate base is unsupported by substantial evidence and arbitrary and capricious when the commission does not adequately explain the reasons for its decision or its reasons for departing from the contrary findings and recommendation of an administrative-law judge.

## OPINION

**FRISCH**, Judge

These consolidated appeals are taken from orders issued by respondent Minnesota Public Utilities Commission (the commission) in setting an electric utility's interim and final rates and approving interim-rate refunds. The utility challenges two decisions by the commission in relation to determining the utility's rate base. And a group of the utility's large industrial customers challenges decisions by the commission in relation to rate design and interim-rate refunds. We conclude that the commission's decision to exclude the

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

utility's prepaid pension asset categorically and entirely from the rate base is not supported by substantial evidence and is arbitrary and capricious. We reject the remaining challenges to the rate base, rate design, and interim-rate refunds because neither the utility nor the customer group have demonstrated a basis to disturb the decisions. We therefore affirm in part, reverse in part, and remand to the commission for further proceedings regarding the utility's request to include the prepaid pension asset in the rate base.

## FACTS

These appeals arise from a general rate case through which relator/respondent Minnesota Power sought to increase the rates it charges for electricity in its service area in central and northern Minnesota. Minnesota Power serves some of the nation's largest industrial customers, including taconite and paper producers, in addition to other commercial and residential customers. Relator/respondent Large Power Intervenors (LPI) is "an *ad hoc* consortium of large industrial end users of electric energy produced by Minnesota Power."[1] Respondent Minnesota Department of Commerce (the department) is charged with enforcing statutes relating to utility ratemaking and acts to protect the interests of ratepayers. *See* Minn. Stat. §§ 216A.01 (authorizing the department to regulate utilities), .07 (setting forth the commissioner's powers and duties) (2022). Respondent

---

[1] The consortium consists of Blandin Paper Company; Boise Paper, a Packaging Corporation of America company, formerly known as Boise, Inc.; Cleveland-Cliffs Minorca Mine Inc.; Enbridge Energy Limited Partnership; Gerdau Ameristeel US Inc.; Hibbing Taconite Company; Northern Foundry, LLC; Sappi Cloquet, LLC; USG Interiors, Inc.; United States Steel Corporation (Keetac and Minntac Mines); and United Taconite, LLC.

3

Office of the Minnesota Attorney General is charged with participating in utilities matters to "represent[] and further[] the interests of residential and small business utility consumers through participation in matters before the [commission]." Minn. Stat. § 8.33, subds. 2, 5 (2022).[2]

***Initiation of General Rate Case***

In November 2021, Minnesota Power filed an application with the commission, in which it sought to increase its "general rates by $108.3 million, or approximately 17.58 percent over current rates, effective January 1, 2022." And, if the commission exercised its statutory authority to suspend the proposed rate increase pending final approval, Minnesota Power requested "an interim rate increase of $87.3 million, or approximately 14.23 percent over current rates, to be effective on January 1, 2022." Minnesota Power designated the 2022 calendar year as the test year for evaluating the reasonableness of the proposed rates.[3]

On December 30, 2021, the commission issued orders accepting Minnesota Power's application, suspending the proposed rates pending the commission's final determination on the application, and referring the general rate case for contested-case proceedings. The

---

[2] Other respondents that did not participate on appeal are Citizens Utility Board of Minnesota (CUB) and Energy Cents Coalition (ECC), both of which advocated for residential customers in the proceedings before the commission. Amicus curiae Public Utility Group, which filed a brief in support of Minnesota Power's positions on appeal, is "an ad hoc consortium of public utilities operating in Minnesota: Northern States Power Company d/b/a Xcel Energy, Otter Tail Power Company, Minnesota Energy Resources Corporation, CenterPoint Energy, Inc., and Greater Minnesota Gas."

[3] As we discuss below, a test year is "the 12-month period selected by the utility for the purpose of expressing its need for a change in rates." Minn. R. 7825.3100, subp. 17 (2023).

commission also issued an order—the interim-rates order—that set interim rates to be charged by Minnesota Power while the rate case was pending. Based on exigent circumstances related to the COVID-19 pandemic, the commission deviated from the statutory interim-rates formula to limit the interim-rate increase for residential customers to 7.11%, while allowing a 14.23% increase for other customer classes, including the industrial classes to which LPI's members belong.

***Contested-Case Proceedings***

An administrative-law judge (ALJ) presided over the contested-case proceedings on Minnesota Power's general rate case. On September 1, 2022, after reviewing submissions by the parties and holding evidentiary and public hearings, the ALJ issued a 155-page report that included detailed and itemized findings of fact, conclusions of law, and recommendations (the ALJ report). The ALJ generally recommended that Minnesota Power was "entitled to increase gross annual revenues in the manner and in the amount consistent with the findings and conclusions of this Report," and the ALJ made specific findings and recommendations on numerous issues disputed by the parties.

***Proceedings Before the Commission***

After receiving exceptions to the ALJ report, the commission held oral argument and issued a decision—the final-rate order—on February 28, 2023. The commission stated that it "concurs in most of [the ALJ's] findings and conclusions. On a few issues, however, the Commission reaches different conclusions, as set forth below. On all other issues, the Commission accepts, adopts, and incorporates [the ALJ's] findings, conclusions, and recommendations." But the commission did not specifically identify which of the ALJ's

5

findings it adopted. Nor did it specifically reject or modify any particular finding by the ALJ. The commission made four determinations in the final-rate order that are pertinent to these appeals.

First, the commission determined, contrary to the ALJ's recommendation, that Minnesota Power would not be allowed to include its prepaid pension asset in its rate base. As the commission recognized, the prepaid pension asset is the result of Minnesota Power, over time, making contributions to its pension plan that cumulatively exceed the amount that Minnesota Power has recovered through rates as pension expense. Minnesota Power sought to include its prepaid pension asset—calculated as "the 13-month average of its 2022 test year pension plan accumulated contributions in excess of net periodic benefit cost"—in "the working capital section of rate base." The ALJ recommended approving this request, but the commission determined that Minnesota Power had not justified rate-base treatment for the prepaid pension asset.

Second, the commission determined, consistent with the ALJ's recommendation, that Minnesota Power's Taconite Harbor Energy Center (Taconite Harbor) should be removed from Minnesota Power's rate base, but that Minnesota Power would be allowed to recover certain related depreciation and expenses. Taconite Harbor is a coal-fired power generation facility owned by Minnesota Power that had been idled since the fall of 2016. The ALJ and commission agreed that the facility should be removed from Minnesota Power's rate base because it was not used or useful during the 2022 test year.

Third, the commission determined, also consistent with the ALJ's recommendation, that Minnesota Power's revenues for the 2022 test year should include revenues that the

6

company expected to receive from ST Paper and the Husky/Cenovus refinery, beginning in 2023 (the anticipated 2023 revenues). ST Paper and the Husky/Cenovus refinery are industrial customers that did not operate during the 2022 test year but were expected to start operations during 2023. The ALJ and commission agreed that the anticipated 2023 revenues should be included in the sales forecast for the 2022 test year.

And fourth, the commission departed from the recommendations of the ALJ and the department to determine that the approved increase to Minnesota Power's revenue requirement would be allocated through "an equally apportioned 9% rate increase with no surcharge on residential ratepayers for the difference between final and interim rates." The preclusion of any surcharge on residential ratepayers was based on Minnesota Power's agreement that residential customers would not be required to pay any additional amounts for the interim-rate period, even though the approved final rates for residential customers were higher than interim rates actually paid by residential customers. But nonresidential customers would be entitled to an interim-rate refund because the paid interim rates were higher than the approved final rates. The final-rate order directed Minnesota Power to make a compliance filing including, as pertinent here, a proposal for interim-rate refunds to nonresidential customers.

Minnesota Power and LPI petitioned for reconsideration and clarification. As relevant to these appeals, Minnesota Power sought reconsideration of the commission's decisions to exclude the prepaid pension asset and Taconite Harbor from the rate base. Minnesota Power also sought clarification that the commission's decision to include the anticipated 2023 revenues in the test year would not impact the calculation of interim-rate

7

refunds. In other words, Minnesota Power argued that it "should not be required to include revenues that it did not receive in calculating interim rate refunds that were in effect during 2022." LPI sought reconsideration of the commission's decision that a 9% across-the-board rate increase was an appropriate revenue allocation.

On May 15, 2023, the commission issued an order denying the parties' reconsideration requests and granting in part the requests for clarification (the clarification order). As relevant to these appeals, the commission clarified that Minnesota Power, in calculating interim-rate refunds, could "exclude sales revenue not received from ST Paper and Cenovus during the period of interim rates." No party sought reconsideration of the clarification order.

On September 29, the commission issued an order approving Minnesota Power's compliance filing (the compliance filing order). In that order, as relevant here, the commission approved Minnesota Power's calculation of interim-rate refunds for non-residential customers based on the methodology that the commission had approved in the clarification order. The commission noted that LPI had submitted comments on Minnesota Power's compliance filing objecting to the methodology but reasoned that the methodology decision "was made in [the clarification order], and LPI did not file a request for Commission reconsideration of that decision."

LPI sought reconsideration of the compliance filing order, arguing that the commission erred by excluding the anticipated 2023 revenues from the calculation of interim-rate refunds. On December 4, the commission denied this request.

8

Minnesota Power and LPI appeal.[4]

## ISSUES

I.      Has Minnesota Power demonstrated a basis to reverse the commission's rate-base decisions on the grounds that

      A.      the decisions result in confiscatory rates?

      B.      excluding the prepaid pension asset from the rate base is unsupported by substantial evidence or arbitrary or capricious?

      C.      removing Taconite Harbor from the rate base is unsupported by substantial evidence or arbitrary or capricious?

II.      Has LPI demonstrated a basis to reverse the commission's decisions to

      A.      allocate Minnesota Power's revenue requirement through a 9% rate increase across all customer classes?

      B.      exclude the anticipated 2023 revenues from the calculation of interim-rate refunds?

## ANALYSIS

Under the Minnesota Public Utilities Act (MPUA), Minn. Stat. §§ 216B.01-.67 (2022 & Supp. 2023), the commission is charged with regulating public utilities. *See* Minn. Stat. § 216B.08. The MPUA generally provides that rates charged by utilities shall be "just and reasonable," Minn. Stat. § 216B.03, and more specifically provides:

> The commission, in the exercise of its powers under this chapter to determine just and reasonable rates for public

---

[4] Minnesota Power and LPI filed separate appeals from the commission's final-rate order after the commission denied their requests for reconsideration in the clarification order, and LPI moved to stay the appeals pending resolution of the request for reconsideration of the compliance filing order. We consolidated the two appeals and stayed them. LPI filed another appeal from the compliance filing order after the commission denied its request for reconsideration of that order. We consolidated the third appeal with the first two and lifted the stay.

> utilities, shall give due consideration to the public need for adequate, efficient, and reasonable service and to the need of the public utility for revenue sufficient to enable it to meet the cost of furnishing the service, including adequate provision for depreciation of its utility property used and useful in rendering service to the public, and to earn a fair and reasonable return upon the investment in such property.

Minn. Stat. § 216B.16, subd. 6.

A utility seeking to raise its rates may commence a general rate case by providing notice to the commission of proposed increased rates, as Minnesota Power did here through the November 2021 application. *See* Minn. Stat. § 216B.16; *see also* Minn. R. 7825.3100-.4600 (2023) (detailing filings required in general rate case). The utility's justification for increasing rates is offered with reference to a "test year," a 12-month period selected by the utility. Minn. R. 7825.3100, subp. 17.

Upon a utility's notice that it is proposing new rates, the commission may suspend the new rates while it "determine[s] whether all questions of the reasonableness of the rates requested raised by persons deemed interested or by the department can be resolved to the satisfaction of the commission." Minn. Stat. § 216B.16, subd. 2. The commission must refer the matter for a contested-case hearing if it "finds that all significant issues raised have not been resolved to its satisfaction" or on petition of a requisite number of affected customers. *Id.* The commission must then order an interim-rate schedule into effect during the pendency of the rate case. *Id.*, subd. 3(a). Interim rates are calculated under a statutory formula unless the commission finds exigent circumstances exist. *Id.*, subd. 3(b). If the commission later finds that the interim rates exceed the final rates authorized, it must order

10

"the utility to return the excess amount collected under the interim rate schedule, including interest on it." *Id.*, subd. 3(c).

In a general rate case, the commission must determine both the utility's revenue requirement and its rate design. *See id.*, subd. 2(c) (allowing the commission to bifurcate proceedings on these two elements of ratemaking). A revenue requirement is generally understood to encompass a utility's costs and a rate of return on its rate base. *See, e.g.*, 73B C.J.S. Public Utilities § 21. A rate base is "[t]he investment amount or property value on which a . . . public utility[] is allowed to earn a particular rate of return." *Black's Law Dictionary* 1515 (12th ed. 2024). "[R]ate design involves the spreading of the increased revenue allowed among the various classes of consumer served by the utility, i.e., the rate schedule which is applied to each class of customer to obtain the desired revenue." *In re Petition of Inter-City Gas Corp. for Auth. to Change its Schedule of Rates for Gas Serv.*, 389 N.W.2d 897, 900 (Minn. 1986) (*Inter-City*) (quotation omitted).

We review decisions of the commission under Minn. Stat. § 216B.52, which allows an aggrieved party directly affected by a decision to appeal "in accordance with chapter 14," also known as the Minnesota Administrative Procedure Act (MAPA), Minn. Stat. §§ 14.001-.69 (2022); *see also* Minn. Stat. § 14.63 (providing for appeal to this court from "a final decision in a contested case"). The commission's decisions "enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *In re Application of Minn. Power for Auth. to Increase Rates for Elec. Serv.*, 838 N.W.2d 747, 757 (Minn. 2013) (*Minn. Power*).

11

Under MAPA, a commission decision may be reversed if the decision violates constitutional provisions or other law, is in excess of statutory authority or jurisdiction, made upon unlawful procedure, is unsupported by substantial evidence, or is arbitrary or capricious. Minn. Stat. § 14.69. And the supreme court has designated standards of review applicable to commission decisions based on the type of power the commission is exercising. *See In re Request of Interstate Power Co. for Auth. to Change its Rates for Gas Serv.*, 574 N.W.2d 408, 412-13 (Minn. 1998) (*Interstate*); *St. Paul Area Chamber of Com. v. Minn. Pub. Serv. Comm'n*, 251 N.W.2d 350, 358 (Minn. 1977) (*St. Paul*). This specification recognizes that "the legislature has granted the [commission] both legislative and quasi-judicial powers to exercise its statutory authority." *Interstate*, 574 N.W.2d at 412.

"The [commission] acts in a legislative capacity when it is 'balancing both cost and noncost factors and making choices among public policy alternatives.'" *Id.* at 413 (quoting *St. Paul*, 251 N.W.2d at 358). When the commission acts in a legislative capacity, the commission's decision "will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence." *St. Paul*, 251 N.W.2d at 358. We review de novo "the question of whether the Commission has exceeded its statutory authority." *Minn. Power*, 838 N.W.2d at 753. And we "resolve any doubt about the existence of an agency's authority against the exercise of such authority." *Id.* (quotation omitted).

The commission acts in a quasi-judicial capacity when it "hear[s] the views of opposing sides presented in the form of written and oral testimony, examin[es] the record,

12

and mak[es] findings of fact." *St. Paul*, 251 N.W.2d at 356. When the commission acts in a quasi-judicial capacity, "the standard of review is the substantial evidence test." *Interstate*, 574 N.W.2d at 413. Under that test, we must "determine whether the [commission] has adequately explained how it derived its conclusion and whether that conclusion is reasonable on the basis of the record." *Minn. Power*, 838 N.W.2d at 757 (quoting *Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n*, 342 N.W.2d 324, 330 (Minn. 1983)).

With these principles in mind, we turn to the issues on appeal raised by Minnesota Power and LPI.

## I.      Minnesota Power's Appeal

Minnesota Power challenges the commission's decisions to exclude its prepaid pension asset and Taconite Harbor from the rate base, arguing that each decision is based on legal error, unsupported by substantial evidence, and arbitrary or capricious.

The MPUA provides the following guidance for the commission in determining a utility's rate base:

> In determining the rate base upon which the utility is to be allowed to earn a fair rate of return, the commission shall give due consideration to evidence of the cost of the property when first devoted to public use, to prudent acquisition cost to the public utility less appropriate depreciation on each, to construction work in progress, to offsets in the nature of capital provided by sources other than the investors, and to other expenses of a capital nature. For purposes of determining rate base, the commission shall consider the original cost of utility property included in the base and shall make no allowance for its estimated current replacement value.

Minn. Stat. § 216B.16, subd. 6.  Accordingly, the supreme court has recognized that "a utility is entitled to a reasonable return on its investment in property used and useful in rendering service to the public." *Senior Citizens Coal. v. Minn. Pub. Utils. Comm'n*, 355 N.W.2d 295, 300 (Minn. 1984) (quotation omitted).  "[T]he used and useful standard simply requires (1) that property be in service, and (2) that it be reasonably necessary to the efficient and reliable provision of utility service." *Id.* (quotation omitted).

The supreme court has applied the substantial-evidence test to the commission's determinations of whether a utility has incurred a cost, whether particular property is used and useful, and whether particular items should be included in the rate base. *See Interstate*, 574 N.W.2d at 415; *In re Petition of N. States Power Co. for Auth. to Change its Schedule of Rates for Elec. Serv.*, 416 N.W.2d 719, 729 (1987) (*NSP*); *see also Minn. Power*, 838 N.W.2d at 757 ("[W]e review factual determinations made within the scope of the agency's statutory authority under the substantial evidence standard.").[5]  We address each of Minnesota Power's challenges to the commission's rate-base decision in turn.

---

[5] LPI asserts that there is ambiguity in the caselaw regarding the standard of review that should apply to the commission's decision to exclude certain investments from the rate base because the determination of the rate base is at least in part a quasi-legislative function. We disagree.  In *NSP*, the supreme court recognized that "in the exercise of the statutorily imposed duty to determine whether the inclusion of the item generating the claimed cost is appropriate, or whether the ratepayers or shareholders should sustain the burden generated by the claimed cost, the [commission] acts in a both a quasi-judicial and a partially legislative capacity."  416 N.W.2d at 722.  The supreme court nevertheless applied the substantial-evidence test. *Id.* at 724.

14

**A.      Minnesota Power has not demonstrated that the rates approved by the commission are confiscatory.**

Minnesota Power argues that each of the rate-base decisions it challenges are "confiscatory" and thus based on legal error.  Rates are confiscatory and violate the Fourteenth Amendment when they "are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service."  *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679, 690 (1923); *see also* U.S. Const. amend. XIV, § 1.  But "[t]o show that a rate is confiscatory, a utility must show with specific information that reduced rates jeopardize the financial integrity of the company, either by leaving it with insufficient operating capital or by impeding its ability to raise future capital."  *In re Request for Serv. in Qwest's Tofte Exch.*, 666 N.W.2d 391, 398 (Minn. App. 2003) (*Qwest*) (citing *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 310 (1989)).  "If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry is at an end.  The fact that the method employed to reach that result may contain infirmities is not then important."  *Duquesne*, 488 U.S. at 310.

We cannot conclude, based on this record, that the rates approved by the commission are confiscatory.  Minnesota Power does not point to specific information in the record from which we can conclude that these rates jeopardize its financial integrity.  *Qwest*, 666 N.W.2d at 398.  And Minnesota Power does not argue that the "*total* effect of the rate order" is confiscatory.  *Duquesne*, 488 U.S. at 310 (emphasis added).  Rather, it suggests infirmities in the ratemaking process, which by themselves do not support a determination that the rates are unconstitutionally confiscatory.  *See id.*  We thus turn to

Minnesota Power's other arguments for reversal of the decisions regarding the prepaid pension asset and Taconite Harbor, respectively.

**B.      The commission's exclusion of Minnesota Power's prepaid pension asset from the rate base is not supported by substantial evidence and is arbitrary and capricious.**

Minnesota Power argues that the commission's decision to exclude Minnesota Power's prepaid pension asset from its rate base is unsupported by substantial evidence and arbitrary or capricious. We begin our analysis by further explaining the nature of the prepaid pension asset, summarizing the ALJ's findings and recommendation, and describing the commission's decision regarding the asset.

As witnesses explained during the contested-case proceedings, Minnesota Power has defined-benefit plans for some of its employees (the pension plan). The pension plan results in pension expense, including benefits paid to current retirees, that is included in Minnesota Power's revenue requirement and is not at issue in this appeal. In addition—and also not contested in this appeal—Minnesota Power is required by federal law to make certain annual contributions to the pension plan, effectively providing advance funding for future pension expense. Over time, the cumulative amount that Minnesota Power has contributed to the pension plan has exceeded the cumulative amount of pension expense. Minnesota Power identifies this excess as its prepaid pension asset.

*The ALJ's Findings*

The ALJ made extensive findings spanning approximately nine pages regarding the prepaid pension asset. The ALJ explained that "[Minnesota Power's] request for recovery of the prepaid pension asset arises because over time, [Minnesota Power] has contributed

more in terms of actual cash and stock to the pension fund than the expense included in rates." And the ALJ found that "[Minnesota Power's] contribution of these funds reduces the amount of pension expense that is included in customer rates," explaining that "the actual funding of the prepaid pension asset earns a return that is applied to reduce annual pension expense for the benefit of customers" and that "[c]ompounded earnings on these contributions can go even further to reduce pension expense." The ALJ found that Minnesota Power had demonstrated the existence and amount of the prepaid pension asset and recommended that it be included in the rate base.

In so recommending, the ALJ rejected several arguments advanced by parties that opposed including the prepaid pension asset in the rate base. First, the ALJ rejected the department's argument that Minnesota Power should not be allowed to include the asset because the pension plan is underfunded. The ALJ explained that the underfunded portion of the pension plan was "simply an estimate of future expenses" reflected on the balance sheet for "transparency purposes" and "irrelevant to determining whether [Minnesota Power] has a prepaid pension asset that is valuable." Second, the ALJ rejected the department's argument that the prepaid pension asset "is not funded 100 percent from investors." The ALJ explained that "[b]ecause the prepaid pension asset is cumulative pension contributions minus cumulative expense, and investors pay for contributions whereas customers pay for expense, the amount by which cumulative contributions exceeded expense is by definition an investor-funded asset." Third, the ALJ rejected the department's argument that the prepaid pension asset should not be included in the rate base because it was temporary. The ALJ concluded that the prepaid pension asset was

17

"indistinguishable from other utility assets, including prepaids, that are included in rate base."

The ALJ also considered previous commission decisions with respect to prepaid pension assets, noting that the commission had rejected requests from some utilities to include a prepaid pension asset in their rate base but had allowed Northern States Power Co. (NSP) to include a prepaid pension asset in its rate base. *See In re Application of N. States Power Co. for Auth. to Increase Rates for Elec. Serv.*, MPUC Docket No. E-002/GR-12-868 (May 8, 2015). The ALJ reasoned that, "[i]n previous cases, the Commission has denied the inclusion of the pension asset in the rate base because the shareholder funding of the pension contributions could not be determined. That is not the situation in this case."

Overall, the ALJ found that

> the inclusion of the present pension expense in rates does not compensate investors for the capital they have advanced to fund the [prepaid pension asset]. The utility and its investors are entitled to recover both the O&M expenses associated with an asset and a return on investments that made the asset possible.

The ALJ also found that "all asset balances are 'temporary' in the sense that they rise and fall as new investments are made and depreciation expense is recognized" and that "[al]though the prepaid pension asset earns an investment return, every dollar of that investment return is used to reduce the pension expense charged to customers."

***The Commission's Decision***

In its final-rate order, the commission's discussion of the prepaid pension asset comprises three pages of its 84-page opinion, two of which summarize the parties' positions on the issue and the ALJ's recommendation. In reaching its decision to reject the ALJ's recommendation regarding the prepaid pension asset, the commission did not specify whether it was rejecting, modifying, or adopting any of the ALJ's extensive findings of fact. Instead, in seven short paragraphs, the commission determined that Minnesota Power "has not justified rate-base treatment of [the prepaid] pension [asset]." The commission explained:

> The accounting asset identified by [Minnesota Power] is distinct from assets typically included in rate base. The asset already earns a return in the form of investment returns, it fluctuates in value, and is misleading in that it does not account for the funding status of the entire pension plan. Here, the commission concurs with the Department and LPI that Minnesota Power has failed to satisfy its burden to show that the prepaid pension asset is entirely funded by shareholders and not partially by market returns.

The commission further stated that "[t]he balances in the prepaid pension asset are temporary, and fundamentally different from typical rate-base assets on which [Minnesota Power] earns a return on investment." And the commission rejected the ALJ's reliance on the commission's decision allowing NSP to include a prepaid pension asset in its rate base, noting that the issue was not contested before the commission "so the Commission's decision did not directly confront this important threshold issue."

*Analysis*

Minnesota Power argues that the commission's decision to exclude the prepaid pension asset from the rate base is unsupported by substantial evidence and arbitrary or capricious. As a threshold matter, we emphasize that the procedural shortcomings in the commission's decision frustrate our review. Here, as in all contested cases, the ALJ issued a report with findings, conclusions, and recommended actions. *See* Minn. Stat. § 14.50 (requiring an ALJ to issue such a report following a contested-case hearing). Under MAPA, an ALJ report becomes the final decision of the agency if the agency does not timely modify or reject it unless otherwise provided by law. *See* Minn. Stat. § 14.62, subd. 2a; *see also In re Surveillance & Integrity Rev. (SIRS) Appeals by Trinity Home Health Care Servs.*, 996 N.W.2d 178, 184-87 (Minn. 2023) (explaining procedure under section 14.62, subdivision 2a). "Every decision and order rendered by an agency in a contested case shall be in writing, shall be based on the record and shall include the agency's findings of fact and conclusions on all material issues." Minn. Stat. § 14.62, subd. 1; *see also* Minn. Stat. § 216B.33 (requiring written commission decisions). And, importantly, "[a] decision or order that rejects or modifies a finding of fact, conclusion of law, or recommendation contained in the [ALJ report] *must* include the reasons for *each* rejection or modification." Minn. Stat. § 14.62, subd. 1 (emphasis added).

In reaching its decision to reject the ALJ's recommendation, the commission failed to set forth which of the ALJ's 58 findings regarding the prepaid pension asset it rejected

20

or modified, much less explain its reasons for each rejection or modification.[6] This lack of specificity thwarts our analysis under the substantial-evidence test because it hinders our ability to determine whether the commission has provided an adequate explanation for its decision and whether that explanation is reasonable based on the record. *See Minn. Power*, 838 N.W.2d at 757. The substantial-evidence test "is rooted in the deference we show to matters that are properly within an agency's particular expertise." *In re NorthMet Project Permit to Mine Application Dated Dec. 2017*, 959 N.W.2d 731, 749 (Minn. 2021) (*NorthMet*). But "[j]udicial deference to the agency's expertise is not a substitute for an analysis which enables the court to understand the [commission's] ruling." *Hibbing Taconite Co. v. Minn. Pub. Serv. Comm'n*, 302 N.W.2d 5, 12 (Minn. 1980). In general, without specification of the findings upon which the commission bases its ultimate decision, we may be unable to effectively determine whether the decision is based on substantial evidence. Under Minn. Stat. § 14.62, subd. 1, a decision rendered by an agency in a contested case that rejects or modifies a finding of fact, conclusion, or recommendation contained in the report of an ALJ required under sections 14.48 to 14.56, must include the reasons for each rejection or modification, and the best practice for compliance with this requirement is for the agency to specifically set forth the findings, conclusions, and

---

[6] And, to the extent the commission intended to adopt the ALJ's findings regarding the prepaid pension asset, the commission failed to explain how its decision to reject the ALJ's recommendation is supported by those findings. Instead, the commission explained its decision in a conclusory manner without reference to specific findings. The commission's failure to provide such an explanation is particularly troublesome because the ALJ's 58 findings appear to strongly support the ALJ's conclusion that Minnesota Power had demonstrated the existence and amount of the prepaid pension asset, as well as the ALJ's recommendation that it be included in the rate base.

21

recommendations of the ALJ that the agency adopts, rejects, or modifies, and to state its reasons for doing so.[7]

In reviewing the analysis that the commission did provide to support its decision to exclude the prepaid pension asset from the rate base, we conclude that it falls short under the substantial-evidence test and reflects arbitrary-and-capricious decision-making.

"[A]n agency decision may fail substantial-evidence review if the agency does not adequately explain the reasons for its decision *or* if the record does not support the agency's reasons for its decision." *In re Issuance of Air Emissions Permit No. 13700345-101 for PolyMet Mining, Inc.*, 965 N.W.2d 1, 9 (Minn. App. 2021) (*PolyMet*) (citing *Minn. Power & Light*, 342 N.W.2d at 329), *rev. denied* (Minn. Sept. 30, 2021). "The [commission] must state the facts it relies on with a reasonable degree of specificity to provide an adequate basis for judicial review." *Hibbing Taconite Co.*, 302 N.W.2d at 12. "[W]hen an agency makes 'conclusory statements,' with 'no analysis of [their] basis,' substantial evidence is lacking." *In re City of Cohasset's Decision on the Need for an Env't Impact Statement for the Proposed Frontier Project*, 985 N.W.2d 370, 381-82 (Minn. App. 2023) (*Cohasset*) (quoting *NorthMet*, 959 N.W.2d at 753); *see also Minn. Power & Light*, 342 N.W.2d at 329 (explaining that the court "could not uphold the [commission's] decision as being supported by substantial evidence" that "lack[ed] explanations").

---

[7] We observe that the commission has sometimes employed this practice by "redlining" the ALJ's findings and conclusions. And at oral argument, counsel for the commission agreed that it is an "excellent practice." We encourage the commission to implement this best practice on remand in this matter and in future matters.

"An agency decision is arbitrary and capricious if it represents the agency's will and not its judgment." *In re Denial of Contested Case Hearing Requests*, 993 N.W.2d 627, 646 (Minn. 2023) (quotation omitted). "In applying the arbitrary or capricious standard, we consider whether a combination of danger signals suggests that the agency has not taken a hard look at the salient problems and has not genuinely engaged in reasoned decision-making."[8] *Id.* at 646-47 (quotation omitted). "The standard of review is not heightened where the final decision of the agency decision-maker differs from the recommendation of the ALJ," but "[r]ejection of the ALJ's recommendations without explanation . . . may suggest that the agency exercised its will rather than its judgment and was therefore arbitrary and capricious." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.*, 624 N.W.2d 264, 278 (Minn. 2001).

In the final-rate order, the commission excluded Minnesota Power's prepaid pension asset from the rate base, categorically and in its entirety. The commission offered two general reasons for its decision. First, the commission stated that prepaid pension assets are different from what it characterizes as typical rate-base assets. In particular, the commission stated its view that prepaid pension assets are "temporary" and that their value

---

[8] In *Minn. Power*, the supreme court indicated that it had "reserved the arbitrary and capricious standard for review of rate design determinations." 838 N.W.2d at 760 n.6. But we note that more recently, the supreme court has indicated that the "arbitrary or capricious standard may be likened to a catchall, picking up administrative misconduct not covered by other more specific paragraphs." *Denial of Contested Case Hearing Requests*, 993 N.W.2d at 646 (quotations omitted); *see also In re Rev. of 2005 Ann. Automatic Adjustment of Charges for All Elec. & Gas Utils.*, 768 N.W.2d 112, 120 (Minn. 2009) (applying arbitrary-or-capricious standard to decision by commission denying variance from rule governing annual reconciliation of natural-gas costs).

"fluctuate[s]." But neither the commission nor LPI disputes that Minnesota Power is required by federal law to contribute to its pension plan, and at least some portion of the prepaid pension asset is attributable to shareholder contributions. Under Minn. Stat. § 216B.16, subd. 6, the commission must give "due consideration," in setting rates, to "other expenses of a capital nature." We therefore hold that a utility's mandatory contributions to pension plans are an "expense[] of a capital nature" to which the commission must give "due consideration" in determining the utility's rate base under Minn. Stat. § 216B.16, subd. 6.

This conclusion is consistent with persuasive authority from other jurisdictions holding that "some or all of a prepaid pension asset should be included in the rate base to the extent that the evidence evinces that the asset was investor-funded, as opposed to ratepayer-funded." *N.M. Att'y Gen. v. N.M. Pub. Regul. Comm'n*, 359 P.3d 133, 139 (N.M. 2015); *see also Midcontinent Indep. Sys. Operator, Inc.*, 172 FERC ¶ 61,169, 62,154 (2020) (articulating similar test to "permit recovery of prepaid pension costs in rate base").[9]

We also note that the commission's conclusion that the prepaid pension asset is materially different in character from other assets in the rate base is not supported by the record. The record reflects that the rate base includes other assets that are temporary and fluctuate in value. As Minnesota Power explained in requesting reconsideration, "all assets and liabilities fluctuate in value—whether they are physical assets that decline in value as

---

[9] The parties also cite decisions from a number of state public utilities commissions, some of which have allowed rate-base treatment for prepaid pension assets and some of which have denied such treatment.

they depreciate (e.g., with plant equipment) or increase in value as they become rare or more highly desired (e.g., with land); or accounts receivable and accounts payable that increase and decrease as payments are made and received; or debt that increases when new debt is issued and decreases as it is paid down." The commission did not adequately explain how the "temporary" status of the prepaid pension asset differs from other assets that fluctuate in value and yet are included in the rate base.

Moreover, the ALJ found that "[Minnesota Power] demonstrated that the prepaid pension asset is indistinguishable from other utility assets, including prepaids, that are included in the rate base"; that "all asset balances are 'temporary' in the sense that they rise and fall as new investments are made and depreciation expense is recognized"; and that "[Minnesota Power] accounts for the changes in the prepaid pension asset balance by using a 13-month average, as it does for the other balances that vary over the year." The commission did not expressly reject these findings, much less explain why it was doing so. Thus, we are left with a decision that is not reasonable on the basis of the record and is not supported by substantial evidence particularly in the absence of any modification to the ALJ's findings of fact. We therefore conclude that, to the extent the commission categorically excluded the prepaid pension asset from the rate base, its decision is unsupported by substantial evidence and arbitrary and capricious.

The commission also articulated a second ground for excluding the prepaid pension asset from the rate base. The commission summarily concluded that "Minnesota Power has failed to satisfy its burden to show that the prepaid pension asset is entirely funded by

shareholders and not partially by market returns."[10] The commission did not explain why it was discounting evidence offered by Minnesota Power that the prepaid pension asset was derived solely from shareholder contributions. Nor did the commission explain why it was rejecting the ALJ's detailed findings crediting Minnesota Power's position. We therefore conclude that the commission's case-specific decision to deny rate-base treatment for the entirety of Minnesota Power's prepaid pension asset is unsupported by substantial evidence because the commission has not provided an adequate explanation. Similarly, the decision is arbitrary and capricious because the commission departed from the ALJ's recommendation without adequate explanation.

If an "agency's findings are insufficient, the case can be either remanded for additional findings *or* reversed for lacking substantial evidence supporting the decision." *PolyMet*, 965 N.W.2d at 11 (quoting *In re Expulsion of A.D.*, 883 N.W.2d 251, 258 (Minn. 2016)). Here, Minnesota Power requests that the matter be remanded for inclusion of the prepaid pension asset in the rate base. The commission urges that, in the event of reversal, the matter should be remanded for additional proceedings, which could involve the commission reopening the record before issuing additional findings if we determine that

---

[10] In its brief on appeal and at oral argument, the commission provided additional explanation for its decision. But the commission is required to issue written orders, *see* Minn. Stat. §§ 14.62, subd. 1, 216B.33, and our certiorari review of the commission's decision is, "by its nature, a review based solely upon the record," *Amdahl v. County of Fillmore*, 258 N.W.2d 869, 874 (Minn. 1977). We therefore limit our review to the reasons articulated in the commission's decision. *Cf. Rsrv. Mining Co. v. Minn. Pollution Control Agency*, 364 N.W.2d 411, 415 (Minn. App. 1985) ("We refuse to allow an agency, which makes an important decision of this nature without written findings and reasons, to rationalize its action on appeal.").

there is a question of whether the prepaid pension asset is completely shareholder funded. Because the decisional defect in this case stems from the commission's failure to explain its findings and conclusions, we conclude that remand to the commission for additional findings is appropriate. *See id.*

In so doing, we acknowledge that the evaluation of prepaid pension assets involves technical and complicated accounting issues in ratemaking proceedings. Standing alone, a utility's mandatory contributions to a pension plan appear to be a cost of doing business that should be included in the rate base. But we cannot conclusively determine Minnesota Power's prepaid pension asset must be included because pension plans also earn market returns and "shareholder contributions do not solely drive prepaid pension assets." *N.M. Att'y Gen.*, 359 P.3d at 139 n.3. The parties dispute the extent to which Minnesota Power's prepaid pension asset is attributable to shareholder contributions as opposed to market returns or negative pension expense. The commission is charged with resolving this dispute as part of its overall duty to determine fair and just rates. *See* Minn. Stat. § 216B.16, subd. 6.

Thus, we reverse the commission's decision to exclude the prepaid pension asset categorically and entirely from the rate base, and we remand for additional findings. The commission may, in its discretion, reopen the record before issuing a revised decision.

**B.** **Minnesota Power has not demonstrated a basis to reverse the commission's decision to remove Taconite Harbor from the rate base.**

Minnesota Power argues that the commission's decision to remove Taconite Harbor from the rate base because it was not "used or useful" during the 2022 test year, is

unsupported by substantial evidence and arbitrary or capricious. We again begin our analysis by further explaining the nature of the asset and summarizing the ALJ's findings and recommendation and the commission's decision regarding the asset.

Taconite Harbor is a coal-fired power generation facility that Minnesota Power acquired in 2001. One of Taconite Harbor's coal-fired units stopped operating in 2015, and the other two units were idled in the fall of 2016 with the commission's approval. Thereafter, the idled units were not part of Minnesota Power's plans to meet the power needs of its customers. The units were offered each year for regional use but were never ordered to operate by the Midcontinent Independent System Operative (MISO).[11] In 2021, Minnesota Power submitted a request to retire the idled units, which the commission approved in January 2023. Minnesota Power nevertheless asserted that Taconite Harbor should be included in its rate base because the units were not yet retired during the 2022 test year and were available for use if needed during the test year.

The ALJ recommended removing Taconite Harbor from Minnesota Power's rate base because the ALJ found that it was not used and useful during the 2022 test year. The ALJ found that

> while [Taconite Harbor] is idled and has ongoing activities for compliance and safety, the core issue based on prior Commission decision-making is whether the [Taconite Harbor] facility is "used and useful" during the 2022 test year. There is no dispute that the facility will not provide service to customers in 2022. Further, there is record evidence

---

[11] The commission describes MISO as "the administrator of the wholesale transmission grid for 15 states and the province of Manitoba" and explains that "MISO designates the generators that will operate at any given moment."

demonstrating that [Taconite Harbor] has not provided service to customers in at least five years.

The commission adopted the ALJ's recommendation, finding that Taconite Harbor was not used and useful during the 2022 test year and thus should be removed from the rate base, but it allowed Minnesota Power certain cost recovery in relation to the plant. The commission explained that Taconite Harbor was not used or useful during the 2022 test year because it was neither in service nor "reasonably necessary to the efficient and reliable provision of utility service." *Senior Citizens Coal.*, 355 N.W.2d at 300 (quotation omitted).

We conclude that the commission's decision satisfies the substantial-evidence test. The commission explained that Taconite Harbor was not used and useful during the 2022 test year because it was neither in service nor necessary to provide electricity during that year. This conclusion is supported by the record. There is no dispute that Taconite Harbor was idle during the 2022 test year and had not been ordered to operate by MISO. In fact, Taconite Harbor has not been operated since 2016. Minnesota Power argues that Taconite Harbor was used and useful during the 2022 test year because it was available for use if ordered by MISO, but availability is not the pertinent consideration under the used-and-useful test. *See id.*

Minnesota Power also argues that the commission's decision is based on legal error and arbitrary or capricious because it conflicts with an earlier commission decision that Minnesota Power asserts required it to keep Taconite Harbor available for use. *See In re Minn. Power's 2016-2030 Integrated Res. Plan*, MPUC Docket No. E-015/RP-15-690,

2016 WL 3941374, at *2 (July 18, 2016). But Minnesota Power cites no authority supporting the proposition that facilities that are not actually in service, and not necessary to provide service during a test year, are used and useful during that test year. And we have previously upheld the commission's exclusion of canceled projects from the rate base when substantial evidence supported that the project was not in service during the test year. *See Otter Tail Power Co. v. Minn. Pub. Utils. Comm'n (In re Petition of Otter Tail Power Co. for Auth. to Increase Rates for Elec. Serv.)*, 417 N.W.2d 677, 687 (Minn. App. 1988), *rev. denied* (Minn. Jan. 5, 1988).

For the foregoing reasons, we affirm the commission's decision to remove Taconite Harbor from Minnesota Power's rate base.

## II.    LPI's Appeals

LPI challenges two of the commission's decisions, the first relating to revenue allocation and the second relating to interim-rate refunds.[12] We address these issues in turn.

### A.    LPI has not demonstrated a basis to reverse the commission's revenue-allocation decision.

We first address LPI's challenge to the commission's decision to allocate Minnesota Power's rate increase through a 9% increase across all customer classes. As LPI acknowledges, this rate-design decision was a quasi-legislative decision by the

---

[12] LPI's principal brief indicated that it was raising a separate challenge to the commission's determination, in the interim-rates order, that exigent circumstances related to the COVID-19 pandemic justified departure from the statutory interim-rates formula for the residential customer class only. But in its reply brief, LPI disclaimed any intent to raise this as a separate issue, and we therefore do not address it.

commission. *See Inter-City*, 389 N.W.2d at 901. As such, "its decisions will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence." *St. Paul*, 251 N.W.2d at 358; *see also Rsrv. Mining Co. v. Minn. Pub. Utils. Comm'n*, 334 N.W.2d 389, 392 (Minn. 1983) ("[T]he [commission's] allocation of revenue responsibility is presumed to be reasonable and just, and the burden is on the appellant[] to show by clear and convincing evidence that the allocation is unjust, unreasonable, or discriminatory."). LPI argues that the commission's decision should be reversed on both grounds. We disagree.

LPI relies on several statutes to support its argument. First, it relies on the general statutory directive for just and reasonable rates, Minn. Stat. § 216B.03. Second, it relies on two energy policies expressed in other statutory sections: Minn. Stat. § 216C.05, subd. 2(4) (2022), which proclaims an "energy policy" that "retail electricity rates for each customer class be at least five percent below the national average," and Minn. Stat. § 216B.1696, subd. 2(a), which states "[i]t is the energy policy of the state of Minnesota to ensure competitive electric rates for energy-intensive trade-exposed customers." LPI argues that the commission's revenue-allocation decision violates these policies and that "guidance from this Court whether a decision from the Commission . . . can completely ignore cost of service is necessary."

We reject the premise of LPI's statutory-authority argument because the commission's final-rate order makes clear that it did not "completely ignore" the cost of service. As directed by statute and caselaw, the commission weighed both cost and noncost factors to determine an appropriate allocation of revenue. The commission acknowledged

31

that Minnesota Power's "[class cost of service study] shows that Residential rates would need to increase significantly to cover the cost of service" and LPI's argument that "the residential class should be apportioned over 50% of the total revenue requirement, phased in over three years," but found that "[t]his dramatic rate increase would almost certainly cause rate shock and does not adequately account for residential customers' ability to pay." The commission also rejected proposals from the department and the attorney general that would have assigned lower percentage increases to residential customers than other customers, reasoning that "these proposals do not go far enough to bring Residential rates closer to cost, and therefore do not adequately account for cost of service, equity, and avoidance of discrimination." The commission "conclude[d] that an equally apportioned 9% rate increase . . . strikes the right balance between the competing factors that the Commission weighs in apportioning the revenue requirement." Thus, the commission clearly considered cost of service in reaching its revenue-allocation decision.

In its reply brief, LPI recasts its statutory-authority argument, questioning "whether there is a point at which the Commission deviates so far from cost of service in rendering a revenue-allocation decision that cost of service was not considered at all, which would be in excess of the Commission's statutory authority[?]" LPI thus appears to concede that the commission did not "completely ignore" cost of service; it instead did not give the weight to that factor that LPI feels was warranted. In the absence of a statutory requirement directing the commission to assign particular weight to cost factors, we reject LPI's argument that the commission exceeded its statutory authority in this regard. *See Rsrv.*

*Mining*, 334 N.W.2d at 393 (rejecting an "argument that the cost of providing service should be the single most important consideration in the setting of utility rates").

With respect to its alternative argument that the commission's revenue-allocation decision results in unjust and unreasonable rates, LPI largely reiterates its objection to the commission's deviation from a strict cost-of-service approach. LPI also argues that residential customers have an ability to pay more and will not suffer rate shock if required to do so. Under Minnesota law, "[c]lear and convincing proof will be shown where the truth of the facts asserted is 'highly probable.'" *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn. 1978). And the supreme court has endorsed a view that no particular rate design is required so long as the commission acts within a zone of reasonableness. *St. Paul*, 251 N.W.2d at 357. We conclude that LPI has not met its heavy burden to demonstrate by clear and convincing evidence that the commission's revenue-allocation decision falls outside that zone.

For the foregoing reasons, we affirm the decision of the commission to allocate Minnesota Power's revenue requirement through a 9% across-the-board increase.

### B. LPI did not properly preserve its challenge to the commission's decision to exclude the anticipated 2023 revenues from the calculation of interim-rate refunds.

We lastly address LPI's challenge to the commission's decision to exclude the anticipated 2023 revenues from the calculation of interim-rate refunds. The commission argues that LPI failed to properly preserve this challenge for certiorari review. We agree.

Specific statutory requirements for administrative exhaustion and issue preservation apply to commission decisions. *See* Minn. Stat. § 216B.27. To preserve an issue for

33

judicial review, a party must seek reconsideration of that issue from the commission by applying to the commission for a rehearing within 20 days after service by the commission of "any decision constituting an order or determination." *Id.*, subd. 1; *see also In re Complaint Against N. States Power Co.*, 447 N.W.2d 614, 615 (Minn. App. 1989) (holding that failure to seek rehearing of commission decision bars certiorari review), *rev. denied* (Minn. Dec. 15, 1989). And "[n]o person or corporation shall in any court urge or rely on any ground not so set forth in the application for rehearing." Minn. Stat. § 216B.27, subd. 2. Thus, the only issues properly before us are those expressly addressed in a party's timely request to the commission for reconsideration.

The commission ordered Minnesota Power to exclude the anticipated 2023 revenues in calculating the interim-rate refunds in the clarification order. LPI did not seek reconsideration of that order within 20 days as required to permit our review of that order. *See* Minn. Stat. § 216B.27, subd. 2. LPI argues that it was precluded from seeking reconsideration of the clarification order because that order also addressed the parties' requests for reconsideration of the final-rate order. It is true that the commission will not entertain "[a] second petition for . . . reconsideration . . . of a commission decision or order by the same party . . . and upon the same grounds as a former petition that has been considered and denied." Minn. R. 7829.3000, subp. 7 (2023). But the decision to exclude the anticipated 2023 revenues from the calculation of interim-rate refunds was first made in the clarification order, and LPI therefore could not have previously sought reconsideration of that decision. It therefore was not precluded from seeking reconsideration—as to that issue—of the clarification order. And, by failing to seek

34

reconsideration, LPI failed to preserve this issue for judicial review. *See* Minn. Stat. § 216B.27, subd. 2.

## DECISION

Under Minn. Stat. § 14.62, subd. 1, a decision rendered by an agency in a contested case that rejects or modifies a finding of fact, conclusion, or recommendation contained in the report of an ALJ required under sections 14.48 to 14.56, must include the reasons for each rejection or modification, and the best practice for compliance with this requirement is for the agency to specifically set forth the findings, conclusions, and recommendations of the ALJ that the agency adopts, rejects, or modifies, and to state its reasons for doing so. We hold that a utility's mandatory contributions to pension plans are an "expense[] of a capital nature" to which the commission must give "due consideration" in determining the utility's rate base under Minn. Stat. § 216B.16, subd. 6. And we hold that the commission's decision to exclude Minnesota Power's prepaid pension asset from the rate base is unsupported by substantial evidence and arbitrary and capricious. But Minnesota Power has not demonstrated a basis to reverse the commission's decision to remove Taconite Harbor from the rate base, and LPI has not demonstrated a basis for reversal of the commission's revenue-allocation decision and forfeited its challenge to the commission's interim-rate refunds decision. We therefore affirm in part, reverse in part, and remand to the commission to make additional findings regarding the prepaid pension asset. The commission may reopen the record on remand in its discretion.

**Affirmed in part, reversed in part, and remanded.**

35